## CAMP et al. v. UNITED STATES.
### No. 2935.

Circuit Court of Appeals, Fourth Circuit.
Oct. 21, 1930.

Toy D. Savage, of Norfolk, Va., for appellants.

Charles T. Hendler, Sp. Atty., Internal Revenue, of Washington, D. C. (Paul W. Kear, U. S. Atty., of Norfolk, Va., and Clarence M. Charest, Gen. Counsel, Bureau of Internal Revenue, of Washington, D. C., on the brief), for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and SOPER, District Judge.

PARKER, Circuit Judge.

This was a suit under the Tucker Act (24 Stat. 505) to recover the federal estate tax paid by the executors of P. D. Camp, deceased. Recovery was asked on the ground that 625 shares of stock in the Camp Manufacturing Company had been overvalued in the return and that, upon a proper valuation thereof, no tax was due. The judge below heard the case upon the merits, found the value of the stock to be greater than shown in the return and rendered judgment in behalf of the United States. From this judgment the executors have appealed.

Much evidence was taken in the court below as to the value of the stock in controversy. The evidence of appellants tended to prove that it was worth not more than $500 per share. The evidence in behalf of the government showed a value as high as $2,000 per share. The learned trial judge, after a careful analysis of the evidence, made the following findings of fact on the question of valuation:

"8. That at the date of the death of the decedent, P. D. Camp, his estate was indebted to Camp Manufacturing Company in the amount of $399,000.00, and that by an arrangement which carried out the family tradition and understanding his estate was allowed to cancel, or return or sell to that company 266 shares of said stock at $1,500 per share, in cancellation or repayment of this indebtedness of $399,000.00, and thereby the market value of that particular stock is fixed and ascertained at $1,500 per share, as the estate was the beneficiary to that extent therefrom.

"9. That the remaining 359 shares of said stock had a market value of $850 per share as of February 5, 1924, or an aggregate value of $305,150.00. Placing a value as hereinabove stated of $1,500 per share on 266 shares of the capital stock of Camp Manufacturing Company, or a total value of $399,000.00, and a value as hereinabove stated on the remaining 359 shares of $850 per share, or a total value of $305,150.00, the average value per share is determined as $1,126.64."

The finding by which a valuation of $1,500 per share was placed upon 266 shares of the stock was based upon the following testimony of one Fitzgerald, an auditor of the Camp Manufacturing Company: "The company took over 266 shares of the stock formerly belonging to Mr. P. D. Camp and it was credited at a price of $1,500 per share. At the same time other stock of the company was taken over from J. L. Camp, P. R. Camp, J. L. Camp, Jr., J. M. Camp, Mrs. Sallie C. Ray and the same amount was allowed for all of that stock, $1,500 per share. There was no money passed in any instance. The stock was simply credited to the respective stockholders as against money or accumulated accounts, regardless of whether it was cash or property. When I went with the Camp Manufacturing Company in the year 1905, Messrs. R. J. Camp, P. D. Camp and J. L. Camp, three brothers, were in charge of the company and it was operated and managed by them from 1905 and theretofore until 1915. They had sole supervision over and I would say dominated the company entirely. Prior to 1919 the affairs of the Camp Manufacturing Company were conducted more on the order of a partnership than it was a corporation. The individual stockholders were permitted to withdraw any amount from the company that they needed and their accounts charged therewith. The same condition extended from 1917 up until 1924. At the time Mr. R. J. Camp died in 1915 he was indebted personally to the company for approximately $220,000 and the

128

corporations or companies in which he was personally interested also owed the company probably $500,000 which made a total indebtedness of Mr. Camp of approximately three-quarters of a million dollars which he was either personally responsible for or responsible for morally or as endorser to the Camp Manufacturing Company. Outside of that he had other indebtedness which also had to be liquidated. The Camp Manufacturing Company, in order to show that he had some estate, agreed to place an arbitrary value of $1,250 a share on his stock in order to show that his assets at the time of his death equaled his liabilities. They assumed and paid all of his liabilities, and in order to have enough assets to meet his liabilities and leave something over to keep the estate from being insolvent, they placed an arbitrary value on the stock. I own one voting share in the company. There was an estimate made of the indebtedness and assets of Mr. P. D. Camp after he died. It was considered necessary for the company to take the stock owned by the estate of Mr. P. D. Camp at the price of $1,500 per share in order to cover the indebtedness due by the estate to the company, in order for the estate of Mr. P. D. Camp to liquidate or be solvent."

While ordinarily we are concluded by the findings of the trial judge on questions of fact, if they have substantial support in the evidence, we think that here the finding of an average value of $1,126.64 for the shares in controversy is vitiated by an error of law. The learned judge, while finding that shares of the corporation had a market value of $850 per share at the time of decedent's death, placed a value of $1,500 each on 266 shares, because, pursuant to a family tradition, they were subsequently taken over by the corporation at that valuation in cancellation of an indebtedness owing by decedent. He did not find that the 266 shares had any such market value; and the evidence is that this valuation was placed on these shares by the company because it was considered necessary for the company to take them at that price for the estate of decedent "to liquidate or be solvent." The judge found that "thereby the market value of that particular stock is fixed and ascertained at $1,500 per share, as the estate was the beneficiary to that extent therefrom." In this we think that there was error.

In determining the value of the estate of a decedent for purposes of taxation, property owned by him is to be given the value which it had at the time of his death. Revenue Act of 1921, § 402, 42 Stat. 278; 26 USCA § 1094; Appeal of Howard K. Walter et al., 2 B. T. A. 453; Appeal of Annie S. Kennedy et al., 4 B. T. A. 330, 333; Ickelheimer v. Commissioner, 14 B. T. A. 1317, 1320. The estate tax is a tax upon the passing of the estate of decedent, and in determining its amount the value of the estate must be taken at the time that it passes, i. e., at the time of death. Subsequent gains or losses through fluctuations in values or through fortunate or unfortunate trades cannot be considered.

In the case at bar, a very advantageous arrangement was made by the executors with the Camp Manufacturing Company, under which the 266 shares of stock were taken over by the company at a price considerably in excess of what the court finds was the fair market value of other shares of the same stock, and as a result a large indebtedness of the estate was extinguished. This, however, did not "fix or ascertain" the price allowed as the value of the shares at the time of decedent's death, any more than a sale of shares on the stock exchange several months later would have done. The fact that the estate was the beneficiary to the extent of $1,500 per share from the stock which was transferred did not affect the value of the stock at the time of death, and the benefit to the estate of transactions subsequent to death was not a matter to be considered in valuing the estate for purposes of taxation. The judge below in determining the value of the stock at the time of death had the right, of course, to consider the price at which it was taken over, along with the other evidence in the case bearing on that question; but he erred in holding that by that transaction alone its value was fixed and ascertained.

On the first hearing of the case, we were of opinion that, because the executors had appealed to the Board of Tax Appeals from notice of a deficiency assessment, there was no jurisdiction in the court below to proceed with the hearing of the case, in view of the fact that the Board was given authority to determine the amount of any overpayment as well as pass upon the deficiency, and of the provision of the statute that, after such appeal had been taken, no refund in respect to the tax should be allowed and no suit for the recovery of any part of same should be instituted. See Act of February 26, 1926, § 319, subsections (a) and (c), 26 USCA § 1120 (a, c). Upon further consideration, however, we think that the court did have

jurisdiction, in view of the fact that the action was instituted before the appeal to the Board was taken. The question has recently been passed upon by the Court of Claims in Ohio Steel Foundry Co. v. United States, 38 F.(2d) 144; and a careful study of the opinion in that case has convinced us that the conclusion there reached is the correct one.

As the appeal pending before the Board of Tax Appeals involves identically the same question as the case here, i. e., the value of the stock at the time of decedent's death, the finding of the tribunal which first passes upon the question will be binding upon the other. For this reason the court below, if it thinks proper to do so, may, upon application, stay proceedings in this case until the Board of Tax Appeals has acted. While this suit was instituted first, it appears that it was not instituted until after there was indication that a deficiency assessment would be made. Furthermore, the amount involved in the appeal before the Board is much larger than the amount involved here, the Board is given the power to determine the refund, if any, to which the executors are entitled as well as to pass upon the deficiency claim of the government and thus settle the entire controversy, and the Board has facilities for passing upon tax matters which in the nature of things the courts cannot have. We do not intend to direct how the judge below shall exercise the discretion as to proceeding with the case or staying proceedings until the Board has acted, but merely to indicate that, in our opinion, he has such discretion, and that the matters which we have mentioned are matters which he may properly consider in exercising same, to the end that a scramble to obtain a decision in one tribunal in advance of action by another may not result, and that such proceedings may be had as will result in an orderly and complete determination of the question in controversy.

The judgment below will be reversed, and the cause will be remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.