**RICHARDSON v. HELVERING, Com'r of Internal Revenue.**

No. 6425.

United States Court of Appeals for the District of Columbia.

Argued May 10, 1935.

Decided Dec. 2, 1935.

C. H. Merillat, of Washington, D. C., for petitioner.

Frank J. Wideman, Asst. Atty. Gen., and Berryman Green and Sewall Key, both of Washington, D. C., for respondent.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

GRONER, Associate Justice.

This petition for review involves federal estate taxes. Petitioner is the widow of Charles W. Richardson, who died in Washington City, August 25, 1929. On the day of his death he and his wife owned as joint tenants certain real estate in the District of Columbia and in Massachusetts, which the Commissioner valued at approximately $450,000. Three parcels are involved; one in Connecticut avenue, another in Grant road, and the third at Duxbury, Mass. The Commissioner imposed a tax under section 302 (e) of the Revenue Act of 1926 (26 U.S.C.A. § 411 (e), based upon the theory that the entire value of the three properties was includable in the gross estate of the decedent. The board approved the Commissioner's action. This question and the board's valuation of 500 shares of the stock of the Union Trust Company, in the name of decedent, are the only two questions open on this petition for review.

A statement of the facts will be helpful. Doctor and Mrs. Richardson were married in 1889. He had been educated in Paris, London, and Vienna, and at the time of the marriage had just begun to practice his profession. Mrs. Richardson's father was a successful Washington florist. Immediately after their marriage they went to live at 404 Rhode Island avenue, and Doctor Richardson maintained an office in his father's home. At that time neither had any private means, except that at the time of marriage Mrs. Richardson had received between six hundred and seven hundred dollars which she then turned over to Doctor Richardson. During their early struggles together Mrs. Richardson's father sent them vegetables, milk, and fowl, and other things produced on his farm located in an outlying section of the District; and Mrs. Richardson took charge of Doctor Richardson's office, kept his instruments clean and in order, attended to his correspondence, kept his books, answered his telephone, and performed all the services which now would be done by a trained nurse.

Doctor Richardson's success as a physician began early in his career. He established a cure for diphtheria by intubation. Very soon in their married life, almost from the beginning, he gave Mrs. Richardson $100 a week for the family budget and for her services in his office, and she in turn, largely by reason of the contributions from her father's farm, was able to save fully $200 a month, which, as she saved it, she turned it over to Doctor Richardson. At her suggestion they maintained only one bank account, and that in his name, though she contracted all the bills, made out all checks, and attended to all the business affairs in which they were jointly engaged. The first money she gave the doctor was used at her request and by joint consent in the purchase of real estate, and as they sold one piece of property the proceeds were put into another; and the deeds were taken from the beginning and thereafter in their joint names, and the unpaid portion of the purchase price was always evidenced by their joint and several promissory notes. There was an agreement between them at the time that if the money invested "came back," it would come back to both of them. "When she would get money from her people she would give it to the doctor immediately to invest for her, and they were both buying things together which would help them both, and that was the understanding."

Doctor Richardson's father was interested in real estate and made it possible for them to purchase lots in a small way and pay for them on time. One of the first pieces of real estate they bought was at Eighteenth street and Columbia road. When it was proposed to them by Doctor Richardson's father, they consulted together and calculated what they had and what they might expect to have in the way of money to pay for it, and agreed to buy it together. It was afterwards sold for a very large profit. This arrangement was typical of all that followed. Their married life was harmonious and free from disagreement, and at Doctor Richardson's death he left his entire share of the estate to his wife. She testified that if she had predeceased him, she would have left everything to him.

Doctor Shute, an intimate friend of Doctor Richardson, and Mrs. Harriet Searle, a sister of Doctor Richardson, testified that it was perfectly understood by their friends and family that there was an arrangement between Doctor Richardson and his wife for the joint investment of their moneys. Mr. Shreve, a lawyer, testified that Doctor Richardson told him that his wife had put just as much into the properties as he had. "He told me that his wife, Amy Richardson, had put just as much into the properties as he had, and then he went on * * * to explain what he meant by that. He explained that she received considerable money from the estate of her father, Henry Small, and she put that money in Doctor Richardson's hands to expend in property; and that she also had, at the beginning of his career and for many years afterwards, acted as his private secretary and as his nurse and as general manager of his business, and his business was run in a very modern manner; and that their moneys they contributed equally to property, and the property belonged equally between them."

Mr. Small (Mrs. Richardson's father) owned a third interest in several valuable Washington properties. One of these was at 1227 New York avenue, another at Fourteenth and G streets, another was the farm on which he lived; and there was still another property on New York avenue. Mr. Small died in 1909. These properties were sold at various times between 1910 and 1926 for sums aggregating approximately $450,000. Mrs. Richardson's share of this sum was received by Doctor Richardson for her account and invested in new properties or in payment of the money owing on properties which they had previously acquired jointly.

At Doctor Richardson's death they owned the three pieces of real estate which we have referred to, namely, 1337 Connecticut avenue, 2901 Grant road, and the Duxbury, Mass., property. The Connecticut avenue property was at the time of purchase conveyed to Doctor Richardson and his wife as joint tenants by deed dated April 20, 1901, for a total consideration of $18,900. A small part was paid in cash, and the balance—$14,175— was evidenced by three promissory notes made by them jointly and severally in the sum of $4,725 each, due in one, two, and three years, respectively, and secured by the property. The deed of trust was released to Doctor Richardson and to Mrs. Richardson on February 24, 1904.

The Grant road property, consisting of 21.14 acres, was acquired, as to part thereof, on March 30, 1896, by deed to Doctor Richardson and his wife as joint tenants. A part of the purchase price was represented by an existing mortgage which was assumed and agreed to be paid by both. The property was added to by other purchases; one on April 13, 1897, the deed to which was taken in the name of Doctor Richardson; another on May 3, 1899, the deed to which was taken in the names of Doctor and Mrs. Richardson as joint tenants. In 1911 additional lots were purchased and the deed taken in the name of Doctor Richardson. In 1917 still other portions were added by deeds taken in the names of Doctor and Mrs. Richardson as joint tenants. In 1922 Doctor Richardson conveyed the portions of the property which had been taken in his own name to a third party who, in turn, conveyed them to Doctor and Mrs. Richardson as joint tenants. In January 1926 another small portion jointly purchased was added to the whole. Mrs. Richardson testified that the two original deeds which had been made out to Doctor Richardson alone were so made out by mistake, and that when he found it out he had them changed and the property reconveyed in their joint names. This was in line with their initial agreement that the transactions should be mutual and equal.

The Duxbury, Mass., property was purchased and conveyed in 1923 by deed to Doctor and Mrs. Richardson as joint tenants. The record is not clear as to the purchase price of this property, but only part was paid in cash; and there is uncontradicted evidence, and it is obviously true, that in 1925 a little more than $5,000 of the money received by Doctor Richardson for the account of his wife from the sale of her father's Rhode Island avenue property was paid in discharge of that much of the balance remaining unpaid.

Section 302 (e) of the Revenue Act of 1926, 44 Stat. 9, requires the inclusion in the gross estate of the decedent, for purposes of federal estate taxation, of the entire value of the property held jointly or by the entirety with any person

or a spouse—except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth.

 The Commissioner tells us that the section is explicit in its requirement that it must clearly appear that the joint tenant or tenant by the entirety contributed something toward the purchase or acquisition of the property, and we think this is a correct statement. The majority of the board, however, rested the decision upon the view that, the exact money contribution of Mrs. Richardson not having been traced through each change in property, that is to say, the evidence not having established clearly that any money earmarked as belonging to her ever was used to purchase any of the particular properties in question, except the payment on the Massachusetts property to which we have referred, Mrs. Richardson had failed to bear the burden imposed by the statute. On the other hand, the member of the board who sat through the hearings and saw the witnesses and heard them testify rejected this narrow view and held that the evidence fully showed a contract by the decedent and his wife existing through their married life, basic in all property accumulation, and that petitioner had satisfactorily shown ownership by purchase for value of half of the properties involved. In our view this conclusion is the one which should be adopted.

Admittedly, all the real estate in question was held jointly, and the evidence establishes that this holding was pursuant to an agreement between the parties made long prior to the enactment of any federal estate tax. Likewise the evidence shows that each of the parties contributed in money and services, from time to time, to the accumulation of a fund which was invested in real estate, which in turn was sold and the proceeds invested in other real estate, and so on, year after year, the title always passing to them jointly, and the properties, both in law and equity, belonging to them equally.

In Bronson v. Brady, 28 App.D.C. 250, we held that a wife may lawfully enter into contracts with her husband, and in Santmyer v. Santmyer, 48 App.D.C. 310, we held that a wife may sue her husband at law upon such contracts. In Ellis v. Ellis, 51 App.D.C. 383, 280 F. 457, we held, in the case of a husband and wife who jointly operated a restaurant, both contributing to its conduct and operation, in the course of which they purchased in the husband's name the building in which the restaurant was located, that evidence of the declarations of the husband that they were copartners, and that at the death of either the one living would get the property, was admissible; and on this evidence held that the property was acquired through their joint efforts and the agreement should be given effect.

Even more than this was decided by the Supreme Court in Stickney v. Stickney, 131 U.S. 227, 9 S.Ct. 677, 33 L.Ed. 136. In that case (which was a District of Columbia case), unlike this case, the entire estate was in the husband's name at the time of his death. The widow brought suit to establish her claims. The evidence was that she had given her husband money from time to time to invest for her account. It was there held that whenever a husband acquires possession of the separate property of his wife, whether with or without her consent, he must be deemed to hold it in trust for her benefit in the absence of any direct evidence that she intended to make a gift of it to him; and, tracing the money to the property, the Supreme Court declared it subject to her claims. There is no question of that kind here, for the reason that Doctor Richardson always recognized his wife's right to a half interest in the property jointly acquired, including the property involved in this review. But it is not going too far to say that, if it were otherwise, the evidence irrefutably establishes that Mrs. Richardson was entitled to and could have compelled recognition of her right to an equal interest in the property. If this is true, as we think it is, no more need be said on the subject, for in such circumstances it is obvious that the statute, considered in its most liberal aspect to the government, is met by showing that Mrs. Richardson's contributions represented "an adequate and full consideration in money or money's worth."

In this view, it is clear that the board erred in applying the tax on the entire value of the properties rather than to the half only which passed at decedent's death.

It was urged upon us in argument by counsel for petitioner that the items involved should not be included at all in the computation of the gross estate for the reason that they were acquired by her husband and herself, as is claimed, as tenants by the entirety, and likewise that, except as to one piece, they were acquired prior to the enactment of the taxing statute. But we think these questions have all been disposed of adversely to these contentions by the Supreme Court and that no more than a reference to the cases is necessary. See Tyler v. United States, 281 U.S. 497, 50 S.Ct. 356, 74 L.Ed. 991, 69 A.L.R. 758; Griswold v. Helvering, Commissioner, 290 U.S. 56, 54 S.Ct. 5, 78 L.Ed. 166; Gwinn v. Commissioner, 287 U.S. 224, 53 S.Ct. 157, 77 L.Ed. 270; Robinson v. Commissioner (C.C.A.) 63 F.(2d) 652; and see, also, Third National Bank & Trust Co. v. White (D.C.) 45 F.(2d) 911, affirmed 287 U.S. 577, 53 S.Ct. 290, 77 L.Ed. 505. See, also, our own opinion in Putnam v. Burnet, 61 App.D.C. 393, 63 F.(2d) 456.

The second question involves the valuation of 500 shares of the capital stock of the Union Trust Company held by decedent at the time of his death.

Petitioner reported these shares in the estate tax return as of the fair market value of $320 per share. This valuation was accepted by the Commissioner and approved by the Board of Tax Appeals. The evidence strongly, indeed, almost convincingly, tends to show that a block of 500 shares of stock of this character could not have been sold at the time of decedent's death at a price of $320 per share; but there is other evidence that the stock had a highly intrinsic value and large earning capacity, and that, in the two months preceding Doctor Richardson's death, in small lots it had sold on the Washington exchange for that figure.

In these circumstances we cannot say that the board did not have substantial evidence which sustained the presumptively correct valuation as made by the Commissioner, and so we sustain the decision on this point.

Affirmed in part, reversed in part, and remanded to the board, with instructions to assess the tax in conformity with this opinion.

MARTIN, Chief Justice, dissents.

HITZ, Justice, died prior to the preparation of this opinion.