**HELVERING, Commissioner of Internal Revenue, v. SAFE DEPOSIT & TRUST CO. OF BALTIMORE.**

No. 4262.

Circuit Court of Appeals, Fourth Circuit.

April 5, 1938.

Maurice J. Mahoney, Sp. Asst. to the Atty. Gen. (James W. Morris, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to the Atty. Gen., on the brief), for petitioner.

Charles McH. Howard, of Baltimore, Md., for respondent.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

The petition for review presents two questions which arise in determining the value of the net estate of a decedent subject to the federal estate tax under sections 302 and 303 of the Revenue Act of 1926, 44 Stat. 9, 70, 72: (1) Whether the value of a block of shares of stock, on the date of decedent's death, must be determined by ascertaining the market value on that date of a single share, in accordance with Article 13 of Regulations 80 promulgated under the Revenue Acts of 1926 and 1932; and (2) whether the amount of a pledge of a contribution by the decedent to a charitable organization, paid after his death, may be deducted from the value of the gross estate.

When Henry Walters, a resident of Baltimore, died on November 30, 1931, he owned 35,966 shares of stock of the Atlantic Coast Line Railroad Company, and 104,663 shares of the Atlantic Coast Line Company of Connecticut, a holding company, both of which were valued in the estate tax return at $30 per share; and he also owned 1,000 shares of stock of the Safe Deposit & Trust Company of Baltimore, which were returned at a value of $550 per share.

The stock of the railroad company was actively dealt in on the New York Stock Exchange, and on November 30, 1931, the date of the decedent's death, the average of the high and low prices was $44 per share in sales aggregating 600 shares. The Commissioner of Internal Revenue accepted this figure as the value per share of the entire block of 35,966 shares. The holding company owned about 27 per cent. of the stock of the railroad company, and other securities. The stock of the holding company was not listed on the New York Stock Exchange, but was listed on the Baltimore and Richmond stock exchanges. Sales were infrequent. From September 25, 1931, to February 2, 1932, the price of the stock on the Baltimore Stock Exchange was pegged at $68; that is, sales at less than $68 were prohibited either on or off the Exchange by members thereof. On the Richmond Exchange there was a sale of 34 shares on November 24, 1931, six days before the death of the decedent, at $44 per share; and a sale of 8 shares on December 7, 1931, seven days after his death, at $30 per share.

The Commissioner accepted $44 per share, the price at which the stock was sold on the date nearest to the decedent's death, as the value per share of the entire block of 104,663 shares. Upon appeal the Board of Tax Appeals valued the stock of both railroad company and holding company at $35 per share. The stock of the Safe Deposit & Trust Company was not listed on any exchange, but frequent sales were made through a brokerage firm in Baltimore that dealt in the stock. Sales between November 9 and November 25, 1931, were made at prices ranging from $640 to $670 per share. The Commissioner determined the value to be $635 per share for the entire block of 1,000 shares. The Board fixed the value at $600 per share.

The testimony of experienced witnesses on behalf of the taxpayer with regard to the value of the 35,966 shares of railroad company stock indicated a value not in excess of $35 per share on the day of death. Factors entering into the estimate included the quoted market price on that day, the volume of sales, the trend of the securities market, the prospects, earnings, and expenses of the company, and especially the number of shares involved which was so large that it could not have been marketed except over a period of not less than two months, and only then at a price much less than that obtainable from the comparatively few shares sold on November 30, 1931. As a matter of fact, an amount of stock equal to the holdings of the estate was sold on the New York Stock Exchange in the period between December 1, 1931, and March 7, 1932, at an average price of $33.92 per share.

On behalf of the Commissioner, the opinion was expressed by an investment counselor and expert that the fair market value of the shares on November 30, 1931, was the stock exchange price of $44 per share on that date; that the size of the block had no bearing because the value of the whole should be based on the unit value, which, by custom on the exchange, is the value per share of 100 shares; that the whole block could not have been sold on November 30, 1931, for $44 per share, but that it could have been disposed of in three principal ways at that price under conditions prevailing in 1931 by obtaining an option on it and then offering it to an investment trust; or offering it to a group of railroad capitalists; or forming a syndicate and selling the stock through a group of distribution houses on commission. The opinion was expressed that the decline in the market in the period after November 30, 1931, during which the marketing of so large a block would have had to take place, should not be considered in estimating the value on that date.

In like manner, a valuation of the 104,663 shares of holding company stock from $32 to $40 per share, based on similar considerations, was given by a witness for the taxpayer; while the witness for the government estimated its worth at $44 per share based principally on the price received at the sale six days before the decedent's death and parity with the price of the railroad stock. The records of the transfer agents showed that, exclusive of transfers by estates, a total of 27,432 shares of the holding company's stock was transferred between the day of death and November, 1935.

With regard to the 1,000 shares of stock of the Safe Deposit & Trust Company, a valuation of $570 on the day of death was made by a Baltimore broker who handled more sales of this stock than any one else, taking into consideration the prices received from sales made shortly before and shortly after the decedent's death, the general decline in the company's earnings, the general decline in market conditions, and the fact that so large a block of stock could not have been sold at once, but could have been marketed only through some such arrangement as a pool of brokers. Testimony on behalf of the Commissioner indicated a value of this stock at $635.

The position of the Commissioner is that none of the testimony bearing upon the difficulty of selling large blocks of stock at the current prices obtained for small lots should have been considered by the Board in making its appraisal. The true and only proper course, it is said, is to follow the strict rule laid down in Article 13 of Regulations 80. In substance this regulation provides that the value of all property includible in the gross estate is the fair market value thereof at the time of the decedent's death; that this value is not to be determined by a forced sale price or by an estimate of what a whole block or aggregate would fetch if placed upon the market at one and the same time; that in the case of shares of stock or bonds, the basis for ascertaining the value is the value of a share or a bond to be ascertained by taking the mean between

the highest and lowest quoted selling prices upon the date of death, and if there were no sales on the date of death, the value shall be determined by taking the mean between the highest and lowest sales upon the nearest date, either before or after the date of death, if within a reasonable period thereof; and in exceptional cases, in which it is established that this method does not reflect the fair market value of securities, other relevant facts and elements of value will be considered, but the size of holdings of any security is not a relevant factor and will not be considered in the determination. The relevant portions of the regulations are set out in the margin.[1]

The values reached by the Commissioner were determined in accordance with this regulation, but the Board declined to follow it. Speaking of its use in valuing the stock of the Atlantic Coast Line Railroad Company, the Board said:

"* * * The petitioner criticizes this as a formalistic mathematical method which in this instance is at variance with reality, primarily because it leaves out of account the paramount circumstance that the block of its shares consisted of 35,-966 shares and that the valuation of this large number of shares involves considerations and factors different from those applicable to the unit daily mean market price resulting from a few 100-share transactions. To this end, it introduced the testimony of witnesses with various kinds of experience, to prove that in fact the sale of 35,966 shares could not be accomplished as readily or simply as the sale of 100 or 600 shares, and that both the seller and the purchaser would make a different investigation before a price, or an aggregation of prices could be arrived at. The Commissioner, on the other hand, submitted the testimony of an investment counselor of experience and learning who made

---

[1] Treasury Regulations 80, promulgated under the Revenue Acts of 1926 and 1932, as amended:

"Art. 13. Valuations.—(1) General. The value of all property includible in the gross estate is the fair market value thereof at the time of decedent's death. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. The fair market value of a particular kind of property includible in the gross estate is not to be determined by a forced sale price or by an estimate of what a whole block or aggregate would fetch if placed upon the market at one and the same time. Such value is to be determined by ascertaining as a basis the fair market value at the time of the decedent's death of each unit of the property. For example, in the case of shares of stock or bonds, such unit of property is a share or a bond. All relevant facts and elements of value as of the time of the decedent's death should be considered in every case. Depreciation or appreciation in value subsequent to the time of the decedent's death are not relevant factors and will not be considered. * * *

"The value of stocks and bonds listed upon a stock exchange shall be obtained by taking the mean between the highest and lowest quoted selling prices upon the date of death. If the decedent died on a Sunday or a legal holiday, the transactions of the next previous business day will govern. If there were no sales on the date of death, the value shall be determined by taking the mean between the highest and lowest sales upon the nearest date either before or after the date of death, if within a reasonable period thereof. If the security was listed upon more than one exchange, the records of the exchange where the security is principally dealt in should be employed. In valuing listed stocks and bonds the executor should observe care to consult accurate records to obtain values as of the date of death.

"If the securities are not listed upon an exchange, but are dealt in through brokers, or have a market, the value shall be determined by taking the mean between the highest and lowest selling prices as of the date of death, or, if there were no sales on that date, of the nearest date either before or after the date of death upon which sales were made, if within a reasonable period. * * *

"In exceptional cases in which it is established by clear and convincing evidence that the value per bond or share of any security determined upon the basis of selling or bid and asked prices as herein provided does not reflect the fair market value thereof, other relevant facts and elements of value will be considered in determining the fair market value. The size of holdings of any security to be included in the gross estate is not a relevant factor and will not be considered in such determination. * * *"

an analysis of what were, in his opinion, the considerations affecting the value of a block of stock of this size, and arrived at the conclusion that, since each share must be of the same value as every other share of the same kind, the unit price of 100 or 600 shares sold correctly represented the unit price of all such shares, irrespective of the number in any block. There was evidence that in all probability the New York Stock Exchange would not have permitted such a large block to be offered for sale on one day, and that if it had the price would have thereby been instantly depressed; that a sale not on the Exchange might have been possible to a capitalist or an investment trust or corporation, but that the stock could only have been sold publicly by 'feeding' it out in small lots over a period of time; that such a period might cover several months, since in fact it was three months after the date of death before the accumulation of sales of similar stock on the Stock Exchange reached 33,000 shares. Exhibits, some of petitioner and some of respondent, show by tables and charts that over a substantial period of time the earnings of the Railroad Co. and the Stock Exchange prices of its shares were declining and would probably continue to decline, and it was testified that one contemplating a transaction involving 35,966 shares would surely not ignore this, as might one engaged in a casual Stock Exchange transaction of a small block.

"The evidence demonstrates to a reasonable assurance that the Commissioner's method, while it has the administrative advantage of certainty, does not, as to this block of shares, result in a figure which is consistent with reality. It seems clear that the unit figure of 44 is too high and can not be sustained. A lower figure must be found and from the evidence, however difficult it may be to find one. That there is room for a flexible judgment as to the point at which supposititious willing buyers might agree with this seller, should not paralyze the function of deciding. Cohan v. Commissioner, 2 Cir., 39 F.2d 540, 543; Bryant v. Commissioner, 2 Cir., 76 F.2d 103, 105; Clinton Cotton Mills, Inc. v. Commissioner, 4 Cir., 78 F.2d 292, 295. A reasonable figure must be fixed within the bounds of the evidence, and if it be not arbitrary it is not important that it can not be rationalized beyond every logical objection. Baltimore & Ohio R. R. Co. v. Commissioner, 4 Cir., 78 F.2d 460, 465;

Hummel-Ross Fibre Corporation v. Commissioner, 4 Cir., 79 F.2d 474, 478.

"On November 30, 1931, the history of the Railroad showed steadily declining earnings, from the end of 1929 at about $15 per share, to less than $10. on the date of death. The stock prices had been going through a general decline, with occasional short spurts upward, since the middle of 1931, when in July it was in the 90's, in September in the 70's, in October in the 60's and 50's, until at the date of death it was, as has been seen, 43-45. Since, as the evidence shows, this performance was embedded in the general economic depression which was at that time well known and widely felt, there was no reason for belief that the downward trend had reached its end, so that stocks which could only be sold piecemeal over a substantial period would continue to command the price of that day. With the information at hand on that day which is present in this record, one could not reasonably have expected to realize for the entire 35,966 shares to be sold during the forthcoming months an average price reflected by a curve projected in any other than the general downward direction which it had taken in the recent past.

"In our opinion, the value of the 35,-966 shares of Atlantic Coast Line Railroad Co. stock on November 30, 1931, was not more than $35 per share, or $1,258,810, and this value has been found as a fact."

Similarly, rejecting the rule as the true measure of the value of the stock of the holding company, and noting a downward trend in the value of the shares between the sales six days before and the sale seven days after the decedent's death, the Board valued these shares at $35 each. Noting likewise with reference to the stock of the Safe Deposit & Trust Company a market greatly declining from early in October, 1931, when the stock brought $695 a share, to a date shortly after the decedent's death, when the stock sold for $590 to $600, the Board fixed a value for this stock of $600 per share.

In short, the Board accepted the testimony offered on behalf of the estate with regard to the depressing effect upon prices that occurs when a market is sought for a large block of stock, and declined to be bound by the restrictions of the regulation. As a general rule, a regulation of an executive department, passed under statutory authority, is valid; but a regulation which

"operates to create a rule out of harmony with the statute, is a mere nullity. * * * And not only must a regulation, in order to be valid, be consistent with the statute, but it must be reasonable." Manhattan General Equipment Co. v. Commissioner, 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528. The essential basis for the determination to be made in the instant case is the fair market value of the property at the time of the decedent's death. But the regulation makes such a determination impossible because it declares that the size of the holding is not a relevant factor and should not be considered in the determination of value; and further provides that if there are no sales on the date of death, then the nearest sale in point of time, whether before or after death, shall control.

How unfairly the latter provision may work out is strikingly illustrated in the case before us. The decedent had a very large amount (104,633 shares) of the stock of the Atlantic Coast Line Company of Connecticut. Six days before his death this stock sold for $44 per share, and seven days after his death for $30 per share. The evidence shows that in the meantime the trend of market conditions was downward. Nevertheless the regulation required the adoption of the higher rather than the lower price, making a difference in value of $1,460,862, and forbade a determination of value at any figure between the two extremes. Obviously, it is an arbitrary and unreasonable rule which attributes absolute verity to the price paid on the nearest date before or after death, and gives no weight whatsoever to a trend of the market indicated by prices prevailing on other dates close by.

■ Similarly the regulation shuts its eyes to reality when it commands that no heed be given to the size or quantity of the property involved. In support of this provision the Commissioner places especial reliance upon the decisions of the state courts in Bingham's Adm'r v. Commonwealth, 196 Ky. 318, 244 S.W. 781, and Walker v. People, 192 Ill. 106, 61 N.E. 489. These cases approve the established rule that if an article is commonly traded in on an open market, and there is such a market available on the crucial date, the prices current in such a market will be regarded as the fair market value of the article. United States v. New River Collieries, 262 U.S. 341, 43 S.Ct. 565, 67 L.Ed. 1014. Starting with this premise, it is contended that as the shares in a corporation are necessarily of equal value, the value of any number of shares, however large, is merely a matter of mathematical calculation when once the value of a single share is established; and if this rule is departed from, not only will property in the hands of a small owner be unjustly appraised at a different value from the same kind of property in the hands of a large owner, but certainty of valuation will be abandoned for mere estimate and conjecture. Moreover, it is said that the fair market value of shares cannot be ascertained from what a large block would probably bring if forced upon the market at one time, because this would amount to a forced sale and would not be in accord with the true rule that a fair market price is that at which property will change hands between a willing buyer and a willing seller, neither being under any compulsion. At the same time it is argued that the value of a large block of stock belonging to an estate cannot be appraised by ascertaining the average price it would bring if sold in small lots during a reasonable period after the death of the decedent, because it is the value on the date of death and not on any subsequent date that is decisive. Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647; Camp v. United States, 4 Cir., 44 F.2d 126.

■ In considering this line of argument, we should bear in mind that the point for decision is not whether in our opinion the market price of the stock on the day of the decedent's death is a better guide to the value of the stock than the estimate of experts based in part upon the large amount of stock involved, but whether that estimate furnishes any substantial evidence whatever to support the conclusion which the Board of Tax Appeals, as the finder of facts, has made. There are certain cases wherein the federal courts on appeal have affirmed a valuation of the Board of a large block of stock based upon the market price of small amounts thereof, notwithstanding the testimony of experts that such a market price was not the true criterion. Roth v. Wardell, 9 Cir., 77 F.2d 124; Richardson v. Helvering, 65 App.D.C. 105, 80 F.2d 548; Rice v. Eisner, 2 Cir., 16 F.2d 358; see, also, Elmhurst Cemetery Co. v. Commissioner, 300 U.S. 37, 57 S.Ct. 324, 81 L.Ed. 491; and in other cases not involving large blocks of stock, the preference of the Board to market quotations rather than expert opinion as a test of val-

ue has likewise been affirmed, Commissioner v. Robertson, 6 Cir., 75 F.2d 540; W. T. Grant Co. v. Duggan, D.C., 18 F.Supp. 724; and under special circumstances it has been held that stock market prices were not necessarily controlling, Rogers v. Strong, 3 Cir., 72 F.2d 455; Heiner v. Crosby, 3 Cir., 24 F.2d 191. But in no federal case, so far as we are advised, has the court passed on the validity of the provisions of the regulation now under attack or decided that expert testimony at variance with market quotations is devoid of substantial probative force.

On the contrary, it was held in Laird v. Commissioner, 3 Cir., 85 F.2d 598, on rehearing, that the value of the stock of a holding company owning large blocks of stock was not to be determined solely by the market price of the shares so held by it, but that the market price was only one factor in the problem; and in Jenkins v. Smith, D.C., 21 F.Supp. 251, in an action to recover overpayment of an estate tax, the court refused to be bound by the regulation and accepted the testimony of experts, confirmed by subsequent events, that a large block of stock could not have been sold except at private sale at a price below the exchange quotations. The size or amount of property owned was likewise held to be an influential factor in determining a value different, either greater or less, from that indicated by the unit price at sales of smaller amounts in Estate of Jos. F. Clabby, 308 Pa. 287, 292, 162 A. 207, 83 A.L.R. 936; People ex rel. Frederick Loeser & Co. v. Goldfogle, 249 N.Y. 284, 164 N.E. 100.

■ In our opinion, the Board was right in basing its conclusions upon the realities as it found them rather than upon considerations of abstract logic. It could not ignore the pregnant fact, having found it to exist, that a large block of stock cannot be marketed and turned into money as readily as a few shares. The opposite condition might possibly have prevailed, for the influence of the ownership of a large number of shares upon corporate control might give them a value in excess of prevailing market quotations; in which event the application of the administrative rule would be unfair to the government. It would have been improper of course to have adopted as the true value of the stock the price obtainable by forcing or dumping the whole block on the market at one time; and

likewise improper to have based the finding on the value as of an earlier or later date. But the Board did none of these things. It took into consideration the difficulty inherent in disposing of so large a quantity of stock, the market price for a few hundred shares on the day of death, and the downward trend of the market as indicated by sales before and after death, and it made an estimate of market value of the whole, as required by the statute. In so doing it was obliged to use its best judgment rather than a cut and dried formula; but this was only the employment of a familiar process which on numerous occasions has been defended by the Commissioner and approved by the courts.

■ The facts relevant to the second question in the case are that on October 20, 1931, Mr. Walters promised to pay a total of $30,000 in weekly installments of $1,500 per week to the Emergency Employment Relief Committee of New York, a charitable organization, in consideration of similar subscriptions by others and in consideration of the endeavor by the Committee to provide temporary and constructive work for unemployed persons within the state of New York. He had paid $6,000 on account at the time of his death. A claim for the balance of his subscription was passed as a valid debt by the orphans' court of Baltimore City in the settlement of the estate, and was paid by the executor and allowed as a credit in the administration account. A subscription made in consideration of subscriptions by others creates a binding and enforceable obligation in Maryland. Sterling v. Cushwa, 170 Md. 226, 183 A. 593.

■ The contention of the Commissioner on this showing is that the amount is not deductible from the gross estate as a claim, because it does not meet the requirement of the statute that claims are deductible only "to the extent that such claims * * * were incurred or contracted bona fide and for an adequate and full consideration in money or money's worth." Section 303 (a) (1), Revenue Act of 1926, 26 U.S.C.A. § 412 note. While the authorities are divided on the point, we are of opinion that the pledge was within the statutory terms of a claim against the estate. In a similar situation it was held in Taft v. Commissioner, 6 Cir., 92 F.2d 667, that when a pledge is contingent upon contribution by others equal to or in excess of

the decedent's pledge, the consideration is money; and the statute does not require that the consideration move to the decedent or that the claim arise in a financial or business transaction. The court said (at page 670 of 92 F.2d): "The weight of authority, however, is clearly to the effect that deductions for claims are nowhere in the statute conditioned upon the consideration supporting them moving to the decedent, although in the usual case that situation will probably exist. The phrasing of the statute is clear, and we see no necessity for reading into it a condition not there expressed. This is the view held by most of the courts which have had occasion to interpret the section."

See, also, Turner v. Commissioner, 3 Cir., 85 F.2d 919, 107 A.L.R. 1468; Commissioner v. Bryn Mawr Trust Co., 3 Cir., 87 F.2d 607; Carney v. Benz, 1 Cir., 90 F.2d 747; United States v. Mitchell, 7 Cir., 74 F.2d 571; compare Glaser v. Commissioner, 8 Cir., 69 F.2d 254; Porter v. Commissioner, 2 Cir., 60 F.2d 673; Bretzfelder v. Commissioner, 2 Cir., 86 F.2d 713; Commissioner v. Porter, 2 Cir., 92 F.2d 426.

Affirmed.