ESTATE OF ROBERT HOSKEN DAMON, DECEASED, ROBERT J. C. DAMON AND LESLIE W. DAMON, COEXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ESTATE OF ROBERT HOSKEN DAMON, DECEASED, THELMA ELINOR DAMON BUDDINGTON, COEXECUTRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2820–64, 2851–64.    Filed November 27, 1967.

*Bernard Hoban* and *David H. Nelson,* for petitioners.
*Donald J. Forman* and *James F. Kennedy,* for respondent.

---

OPINION

The principal issue involved concerns the valuation as of January 16, 1961, the alternate valuation date elected by the executors of the estate under section 2032 of the Internal Revenue Code of 1954, of the common stock of Bowser owned by the decedent at the time of his death and which continued to be owned by his estate at the alternate valuation date. This consisted of 240,801½ shares out of a total of 721,765 shares of Bowser common stock outstanding (of which a subsidiary of Bowser owned 87,614½ shares). The stock was included in the estate tax return at a value of $3 per share. Respondent determined that the value of the stock was $6 per share.[3]

The estate's contention is that the Bowser common stock was actively traded in the over-the-counter market, that the value of the stock for estate tax purposes must be fixed by reference to sales in such market, and that such value should be fixed at $3 per share or at most $3.45 per share, which it contends was the average price at which Bowser common stock was sold in the market over the period December 29, 1960, through January 16, 1961. It relies upon section

---

[3] The value of $3 per share was determined by two executors, Damon, Jr., and Leslie Damon. Mrs. Buddington, the third executor, although signing the return, stated that she disagreed with the valuation of $3 and stated that in her opinion the value of the stock was $6 per share. The two executors filed a petition on behalf of the estate (docket No. 2820–64), in which they contested the respondent's valuation of the stock, as well as certain other determinations made by him. Mrs. Buddington also filed a petition on behalf of the estate (docket No. 2851–64) wherein she raised the same issues as were raised in the other docket, except that she did not contest the respondent's valuation of the stock. The two dockets were consolidated for trial, opinion, and decision. Mrs. Buddington did not file briefs, but the other executors did. Accordingly, the contentions of the estate referred to herein are those made on brief by the other two executors.

2031(b) of the Internal Revenue Code of 1954 [4] and section 20.2031–2(b) of the Estate Tax Regulations.[5]

The respondent, on the other hand, contends that this block of stock represented effective control of Bowser; that accordingly, under the provisions of section 20.2031–2(e) of the regulations, the price at

---

[4] Sec. 2031 of the Code provides in part as follows:

DEFINITION OF GROSS ESTATE.

(a) GENERAL.—The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value * * * of all property, real or personal, tangible or intangible, wherever situated, * * *

(b) VALUATION OF UNLISTED STOCK AND SECURITIES.—In the case of stock and securities of a corporation the value of which, by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange.

[5] The Estate Tax Regulations provide in pertinent part as follows:

Sec. 20.2031–1(b). *Valuation of property in general.* The value of every item of property includible in a decedent's gross estate * * * is its fair market value * * *. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * * The value is generally to be determined by ascertaining as a basis the fair market value as of the applicable valuation date of each unit of property. For example, in the case of shares of stock or bonds, such unit of property is generally a share of stock or a bond. * * *

Sec. 20.2031–2. Valuation of stocks and bonds.

(a) *In general.* The value of stocks and bonds is the fair market value per share or bond on the applicable valuation date.

(b) *Based on selling prices.* If there is a market for stocks or bonds, on a stock exchange, in an over-the-counter market, or otherwise, the mean between the highest and lowest quoted selling prices on the valuation date is the fair market value per share or bond. If there were no sales on the valuation date, but there were sales on dates within a reasonable period both before and after the valuation date, the fair market value is determined by taking a weighted average of the means between the highest and lowest sales on the nearest date before and the nearest date after the valuation date. The average is to be weighted inversely by the respective numbers of trading days between the selling dates and the valuation date. * * *

(c) *Based on bid and asked prices.* If the provisions of paragraph (b) of this section are inapplicable because actual sales are not available during a reasonable period beginning before and ending after the valuation date, the fair market value may be determined by taking the mean between the bona fide bid and asked prices on the valuation date, or if none, by taking a weighted average of the means between the bona fide bid and asked prices on the nearest trading date before and the nearest trading date after the valuation date, if both such nearest dates are within a reasonable period. The average is to be determined in the manner described in paragraph (b) of this section.

*       *       *       *       *       *       *

(e) *Where selling prices or bid and asked prices do not reflect fair market value.* If it is established that the value of any bond or share of stock determined on the basis of selling or bid and asked prices as provided under paragraphs (b), (c), and (d) of this section does not reflect the fair market value thereof, then some reasonable modification of that basis or other relevant facts and elements of value are considered in determining the fair market value. Where sales at or near the date of death are few or of a sporadic nature, such sales alone may not indicate fair market value. In certain exceptional cases, the size of the block of stock to be valued in relation to the number of shares changing hands in sales may be relevant in determining whether selling prices reflect the fair market value of the block of stock to be valued. If the executor can show that the block of stock to be valued is so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market, the price at which the block could be sold as such outside the usual market, as through an underwriter, may be a more accurate indication of value than market quotations. Complete data in support of any allowance claimed due to the size of the block of stock being valued shall be submitted

which the stock sold in the over-the-counter market did not reflect the true value of this block of stock; and that the block should be valued at $6 per share. He refers, for corroboration of his valuation of $6 per share, to the sale on April 24, 1961, by the estate and two of its beneficiaries, of 75,000 shares of Bowser common stock at $6 per share.

It will be noted that the Estate Tax Regulations provide that if there is a market, including an over-the-counter market, for a particular stock, the average quoted selling price on the valuation date is the fair market value per share and is the basis for the determination of the value of the stock to be included in the gross estate, unless it is established that such selling price does not reflect the fair market value of the stock to be valued, as where sales at or near the date of death are few or of a sporadic nature, or where the block of stock is so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market, or where the block of stock represents either an actual or effective controlling interest in a going business.

As stated, the respondent's position that the trading on the over-the-counter market did not represent the true value of the estate's block of Bowser common stock is based upon his contention that such block of stock represented control of Bowser.

Obviously the 240,801½ shares of Bowser common stock owned by the estate did not represent *actual* control of the corporation, since it was substantially less than 50 percent of the total number of shares outstanding, 721,765 shares (or 634,150½ shares, if the shares owned by a subsidiary are considered as not outstanding). Furthermore, we think the evidence is sufficient to establish that the block of 240,801½ shares did not, in itself, constitute *effective* control of the corporation. At the time of the directors meeting held on January 27, 1960, the Damon interests did not possess control of the corporation, even though they owned, in addition to the 240,801½ shares in question, 25,000 others shares. The respondent relies heavily upon

---

with the return. On the other hand, if the block of stock to be valued represents a controlling interest, either actual or effective, in a going business, the price at which other lots change hands may have little relation to its true value.

(f) *Where selling prices or bid and asked prices are unavailable.* If the provisions of paragraphs (b), (c), and (d) of this section are inapplicable because actual sale prices and bona fide bid and asked prices are lacking, then the fair market value is to be determined by taking the following factors into consideration:

    *        *        *        *        *        *        *

(2) In the case of shares of stock, the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors. Some of the "other relevant factors" referred to in subparagraphs (1) and (2) of this paragraph are: the good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. * * *

the fact that the Damon interests were able by the latter part of May 1960 to obtain effective control of the corporation. But, of course, we are not concerned with the control which the Damon interests were able to muster, but with the question whether the block of stock in question itself represented control. Actually, the Damons were able to obtain effective control only by obtaining proxies of other stockholders. The respondent states that the fact that when the 75,000 shares of stock of the estate and two of its beneficiaries were sold at $6 per share a voting trust agreement was executed to keep the block intact demonstrates that the block carried with it effective control. He argues that the purchasers would not otherwise have paid $6 per share. We are not persuaded by this argument. As pointed out, the Damons obtained effective control through the voting power of not only the estate's block of stock, but also the voting power of other stock which they owned and of stock owned by other persons. Under the voting trust agreement the shares sold and the remaining shares owned by the trust were to be voted as a block for two directors to be named by the purchasers. Apparently the purchasers were willing to pay $6 per share on the prospect that the Damon interests would continue, with the aid of other stockholders, to maintain effective control. Nor does the fact that representatives of the estate, in negotiations with prospective purchasers, were asking $10 per share for a sale of the whole block of 240,801½ shares and $6 per share for a sale of a portion thereof establish that the block of stock in question itself represented effective control.

The respondent's position that the trading in the over-the-counter market did not reflect the true value of the estate's block of Bowser common stock is not based upon a contention that there was an absence of sales in the over-the-counter market or that the sales were few or of a sporadic nature. Indeed, the records of the transfer agents of Bowser show that over the period from January 1, 1960, through January 17, 1961, a total of about 1,320 holders of Bowser common stock transferred over 500,000 shares of stock (although these transfers could have included, to an extent not shown, gifts, transfers from brokers to principals, and reissues of new certificates for various reasons). And during the period December 14, 1960, through January 17, 1961, over 14,000 shares of stock were traded in about 60 transactions in the over-the-counter market. It is our opinion that this volume of sales is sufficient to establish that such market may reasonably be relied upon to establish the fair market value of Bowser common stock. See *Estate of Caroline McCulloch Spencer*, 5 T.C. 904. On the valuation date, January 16, 1961, there was a sale of Bowser common stock in the over-the-counter market at $3.75 per share. While there was only one sale on such date, it appears that the selling price was generally consistent with the prices at which the Bowser

stock had been traded during the preceding period of approximately 1 month. See *Estate of Caroline McCulloch Spencer, supra.* Under the circumstances, we are of the opinion that the value of the estate's block of stock on January 16, 1961, was $3.75 per share, and we have so found as a fact.[6] In this connection it is to be observed that the sale by the estate and two of its beneficiaries of 75,000 shares of Bowser common stock in a transaction outside the over-the-counter market did not occur until April 24, 1961, which was more than 3 months after the valuation date with which we are concerned. At such valuation date the purchasers had made no commitment to purchase at $6 per share. We think, therefore, particularly in view of the provisions of the regulations, that such sale is not a factor to be considered in establishing the value of the estate's stock at the valuation date.

On brief the estate contends that on the valuation date the stock had a value of $3, or at most $3.45 per share. It refers, among other things, to the average price at which Bowser common stock was sold in the over-the-counter market over a period prior to the valuation date. We think such prior sales are not determinative in view of the fact that there was a sale in the over-the-counter market on the valuation date at $3.75 per share. The same is true, for the same reason, with respect to certain evidence relating to the financial condition and history of Bowser. The estate relies, among other things, upon the so-called "blockage" theory which is to the effect that a block of stock to be valued may be so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market. However, as we stated in *Safe Deposit & Trust Co. of Baltimore, Executor,* 35 B.T.A. 259, affd. (C.A. 4) 95 F. 2d 806, blockage is not a principle of law or a rule of evidence, and evidence must be adduced to justify the application of the theory. The estate has not shown that the registered stock could not have been liquidated on the over-the-counter market within a reasonable time without depressing the market, or that the unregistered stock could not have been sold outside the over-the-counter market at a price equal to the price at which the registered shares sold on such market on the valuation date.

The second issue relates to the deduction of $630 claimed by the estate in its estate tax return as an administration expense. Such amount was paid by the executors to a rental agency as a commission

---

[6] Of the 240,801½ shares of Bowser common stock owned by the estate, 212,710½ shares were not registered with the Securities and Exchange Commission and, therefore, could be sold only to purchasers who would furnish statements that the purchases were for investment and not for distribution. The estate does not contend that the unregistered stock was of a lesser value because of the restriction of the sale thereof to purchasers for investment, nor does the respondent contend that there was any difference in the value of the registered and unregistered stock. The registered and the unregistered stock carry the same provisions, except for the sale restriction, and we see no reason why, upon the record herein, the value established by the over-the-counter market should not apply to both.

for the subleasing of an apartment which the decedent held under lease at the time of his death. In the notice of deficiency the respondent stated that since this item was deducted on the income tax return it could not be deducted for Federal estate tax purposes. From statements made by counsel for the respondent at the hearing it appears that the respondent had reference to a deduction taken on an income tax return, Form 1040, filed on behalf of the decedent for the period prior to his death. The petitioner argues that the fact that the amount in question may have been deducted on such return would not itself preclude the deduction in the estate return. We agree that this is so, but it must be shown that it is a proper deduction from the gross estate. It is well established that a taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms. *New Colonial Co.* v. *Helvering*, 292 U.S. 435. Section 2053 of the Code provides generally for the deduction of administration expenses. The evidence with respect to this item is meager. There is no proof as to the terms of the lease and sublease or other details, except that Mrs. Buddington testified that the apartment was subleased for $200 per month more than the rent called for under the decedent's lease and that such difference was received by the estate, and that she did not deduct it on her individual income tax return for 1960. The amount of $630 might properly be deductible from income of the estate earned after the decedent's death, but that issue is not before us. Suffice it to say that it has not been established that it constitutes a proper deduction for estate tax purposes.

The estate contends that, since it paid to Illinois authorities an amount of $10,038.89 on account of Illinois inheritance tax, it is entitled to a credit in that amount under section 2011 of the Code against the Federal estate tax paid.[7] The respondent contends that the payment represented merely a deposit rather than Illinois inheritance taxes "actually paid" within the contemplation of section 2011. Illinois law in effect during the period involved herein provided that Illinois death taxes shall be:

due and payable, at the death of the decedent, and interest at the rate of seven per cent per annum shall be charged and collected thereon for such time

---

[7] Sec. 2011 of the Code provides, in part, as follows:

(a) In General.—The tax imposed by section 2001 shall be credited with the amount of any estate, inheritance, legacy, or succession taxes actually paid to any State or Territory or the District of Columbia, in respect of any property included in the gross estate (not including any such taxes paid with respect to the estate of a person other than the decedent).

 *  *  *  *  *  *  *

(c) Period of Limitations on Credit.—The credit allowed by this section shall include only such taxes as were actually paid and credit therefor claimed within 4 years after the filing of the return required by section 6018, except that—

(1) If a petition for redetermination of a deficiency has been filed with the Tax Court within the time prescribed in section 6213(a), then within such 4-year period or before the expiration of 60 days after the decision of the Tax Court becomes final.

as said taxes are not paid: * * * provided further, that where prior to the final determination of the amount of the tax a sum of money is deposited with the county treasurer to be applied to the payment of the tax when finally determined, if such deposit be made within said eighteen month period, interest shall be charged only on the excess, if any, of the tax over the deposit not paid or deposited within said eighteen month period * * *

* * * the amount whereby any such deposit shall exceed the tax as finally determined shall be promptly refunded to the depositor * * *

Ill. Ann. Stat., ch. 120, sec. 377 (Smith-Hurd).

We think that the amount paid represented only a deposit to be applied in payment of the tax when determined and therefore did not represent a tax "actually paid" for purposes of the credit provided for by section 2011. See *Edward C. Moore, Jr., et al., Executors*, 21 B.T.A. 279. However, in the Rule 50 computation effect will be given to the credit for Illinois death taxes actually paid. Attention is also called to section 2011(c)(1) which provides that the credit may be claimed at any time before the expiration of 60 days after the decision of this Court becomes final.

*Decision will be entered under Rule 50.*