## UNITED STATES v. MITCHELL et al.
### No. 5130.

Circuit Court of Appeals, Seventh Circuit.

Dec. 8, 1934.

572

Ill., and Sewall Key and Carlton Fox, Sp. Assts. to Atty. Gen., for the United States.

Edward F. Colladay and Wilton H. Wallace, both of Washington, D. C., and David O. Dunbar, Stanley Rich, and Clinton Merrick, all of Chicago, Ill., for appellees.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

EVANS, Circuit Judge.

The issue to be determined upon this appeal is whether claims, totaling $170,013.78, based on decedent's oral promise to pay possible losses arising out of loans to others, are to be deducted in arriving at the net taxable estate for the purpose of determining estate taxes under section 303 (a)(1), Revenue Act 1926 (26 USCA § 1095(a)(1).[1]

John J. Mitchell died October 29, 1927, leaving an estate which was subject to the Federal estate tax. In October, 1928, a tax of $175,183.17 was paid. On March 14, 1930, the Government sent a notice of a deficiency tax of $118,840.64. This sum was paid June 23, 1930. A claim for refund was filed a few months later. As it was not allowed, appellees, as executors of the estate, brought this action to recover $47,140.97 and interest. Appellant conceded part of the claim, the balance of which was contested. A judgment was entered against appellant for $31,-573.82 and interest, and this appeal resulted.

The controlling facts may be stated by quoting from the court's finding:

"Decedent was chairman of the board of directors of the Illinois Merchants Trust Company, now by succession Continental Illinois National Bank and Trust Company of Chicago. Certain members of his family were largely interested as stockholders and officers in two separate corporations known as Inland Glass Manufacturing Company and Cord Tire Corporation. Said two companies, finding themselves in need of financial assistance, approached Mr. Geddes, one of the loaning officers of Illinois Merchants Trust Company, with a view to obtaining

Frank J. Wideman, Asst. Atty. Gen., Dwight H. Green, U. S. Atty., of Chicago,

---

[1] Sec. 303. "For the purpose of the tax the value of the net estate shall be determined—

"(a) In the case of a resident, by deducting from the value of the gross estate—

"(1) Such amounts for funeral expenses, administration expenses, claims against the estate, unpaid mortgages upon, or any indebtedness in respect to, property (except, in the case of a resi-

dent decedent, where such property is not situated in the United States), to the extent that such claims, mortgages, or indebtedness were incurred or contracted bona fide and *for an adequate and full consideration in money or money's worth,* * * * as are allowed by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered. * * *"

5

5

5

banking credit. Mr. Geddes advised officials of both said companies that since said companies were new enterprises being conducted by unseasoned executives, they should not seek banking credit but that said companies should conduct their business on capital furnished by those interested therein. After this conversation the officers of said companies had some negotiations with the Union Trust Company of Chicago with reference to banking connections. When the attention of decedent was called to this fact by members of his family, Mr. Mitchell expressed personal chagrin that the companies in which his family were so largely interested and of which his sons were executive officers and directors could not do their banking business with the institution of which he was chairman of the board of directors, and he expressed a desire to have said companies do business with Illinois Merchants Trust Company. As an inducement to Illinois Merchants Trust Company to make loans to said two corporations, Mr. Mitchell stated to Mr. Geddes and to the executive officers of the Trust Company that he would not permit that institution to suffer any loss as a result of loans made either to Cord Tire Corporation or the Inland Glass Manufacturing Company. He agreed to indemnify the Trust Company against all loss in connection with loans so made. At the instance of decedent and relying upon his indemnity agreement, the Illinois Merchants Trust Company from time to time did make loans to said two companies. From time to time as these loans came up for renewal decedent reiterated his statement that he would not permit the Bank to suffer any loss by reason of said loans. As security for loans made to Inland Glass Manufacturing Company, decedent also hypothecated and pledged to the Bank by a written instrument 200 shares of the capital stock of Commonwealth Edison Company, which stock was included for tax purposes in decedent's gross estate at $33,400.

"At the time of decedent's death, the Cord Tire Corporation and Inland Glass Manufacturing Company were * * * insolvent and in such condition financially that suits against them by the Trust Company for the collection of said indebtedness to it would have been idle formality. Both companies were hopelessly insolvent."

The notes of the Inland Glass Co. were signed "Inland Glass Mfg. Co. John J. Mitchell, Jr., Vice Pres.," and the notes of the Cord Tire Corp. were signed in the corporate name by a corporate officer.

The District Court held that deceased's liability was collateral and not primary; that the debt was voidable and not void under the Statute of Frauds; and that the claims were deductible under section 303 (a) (1) of the Revenue Act of 1926.

The two determinative questions on this appeal are: (1) Was the bank's claim against Mitchell, assuming it to be a valid enforceable one, deductible under section 303 (a) (1) of the Revenue Act of 1926? (2) Did Mitchell's agreement with the bank fall within the Illinois Statute of Frauds?

We will dispose of several minor contentions advanced by appellees as additional grounds for sustaining the decree with but brief comment.

The fact that a claim was presented and allowed in the Probate Court and subsequently paid by the executors has no bearing on the deductibility of the claim in question under section 303 (a) (1). One may pay a claim which he is under no legal obligation to satisfy. He may make gifts. He may waive legal defenses and, prompted by most commendable motives, assume and pay obligations that have no legal basis for support. Donnelley v. Commissioner (C. C. A.) 68 F.(2d) 722.

Nor can an asserted obligation which was enforceable only at the option of the deceased obligor be deducted. The mere fact that a contract within the Statute of Frauds is voidable and not void does not permit the executors of the estate to waive the obligor's defense after the latter's death so as to avoid an estate tax.

In reaching this conclusion we are not relying upon the last sentence of Article 36 of Regulations 70, which reads as follows: "Only claims enforceable against the estate may be deducted." We do not believe it was within the power of the Commissioner to limit by regulation the scope of deductible claims which were defined by the statute. But irrespective of the regulation, only enforceable claims against the estate may be deducted.

If claims not legally enforceable against the estate but which are voidable in character, or which are predicated upon a moral obligation only may be deducted, the temptation to assume claims that might well be paid by heirs would be well nigh irresistible. In the present case, it may have been laudable for those in charge of the estate of the

decedent to pay all claims for which there was a legal or moral obligation on the part of the decedent to pay had he lived. On the other hand, there was as urgent a moral obligation on the part of the legatees who contracted the indebtedness to pay these notes as there was on decedent, and had they paid them there would have been no claim against the estate. Moreover, the claimant in the Probate Court and the executor who filed no objections to the claim were one and the same party, a party situation which should not be permitted.

■ (1) Assuming the decedent's promise was outside the Statute of Frauds, was it a deductible one under section 303?

The allowance of the deduction of this claim must find authorization in the statute. The above-quoted section (section 303 (a) (1) permits of deductions of "claims against the estate * * * to the extent that such claims, mortgages, or indebtedness were incurred or contracted bona fide and for an *adequate* and *full* consideration *in money or money's worth.*" The claim, however, must be "for an adequate and full consideration in money or money's worth." The italicized words are unusual and significant. If appellees' deduction is to be denied, it must be traceable to these words.

A study of the history of the section throws some light on the Congressional intent. We quote from the Acts of 1921, 1924, and 1926 (Revenue Act 1921, § 403 (a) (1), 42 Stat. 279; Revenue Act 1924, § 303 (a) (1), 26 USCA § 1095 note; Revenue Act 1926, § 303 (a) (1), 26 USCA § 1095 (a) (1).[2]

It is apparent that the 1924 and 1926 Acts successively narrowed the scope of deductible claims.

It is appellant's contention that the "adequate and full consideration in money or money's worth" must have passed *to the decedent* before a claim may be deducted. Reliance is placed on the opinion in Latty v. Commissioner (C. C. A.) 62 F.(2d) 952, 954, where it is said:

"The soundness of the above-stated conclusion is emphasized, we think, when we consider the purpose and effect of the addition to the analogous section of the 1921 act (42 Stat. 278, § 402 (c) of the clause permitting the deduction of claims against the estate only to the extent that such claims were 'incurred or contracted bona fide and for a fair consideration in money or money's worth.' Possibly the reason why this clause has not been specifically the subject of judicial construction is that its meaning seems fairly apparent to the ordinary intelligence. In the present case we are not so much concerned with whether there was a 'fair' consideration, although it might be somewhat difficult to say just what legal right Mrs. Jackson relinquished by her contract, as we are with whether the consideration moving to the father may rightly be considered as a consideration 'in money or money's worth.' There are instances in which it is practically impossible to say that a fair consideration is not to be regarded as a consideration in money or money's worth (cf. Ferguson v. Dickson, 300 F. 961 [C. C. A. 3], involving a contract in consideration of marriage), but we think that ordinarily these words must be construed to evidence an intent upon the part of Congress to permit the deduction of claims only to the extent that such claims were contracted for a consideration which at the time either augmented the estate of the decedent, granted to him some right or privilege he did not possess before, or operated to discharge a then existing claim, as for breach of contract or personal injury."

It also relies on section 302 (i), Revenue Act 1926 (26 USCA § 1094 (i) which makes reference to the amount of the deduction as follows:

" * * * there shall be included in the gross estate only the excess of the fair market value at the time of death of the prop-

---

[2] Act of 1921:

"Sec. 403. * * * (a) In the case of a resident, by deducting from the value of the gross estate—

"(1) * * * Claims against the estate. * * *"

Act of 1924:

"Sec. 303. (a) In the case of a resident, by deducting from the value of the gross estate—

"(1) * * * Claims against the estate * * * to the extent that such claims, mortgages, * * * were incur-

red or contracted bona fide and for a fair consideration in money or money's worth. * * *"

Act of 1926:

"Sec. 303 (a) In the case of a resident, by deducting from the value of the gross estate—

"(1) * * * Claims against the estate * * * to the extent that such claims * * * were incurred or contracted bona fide and for an adequate and full consideration in money or money's worth. * * *"

erty * * * over the value of the consideration *received therefor by the decedent."*

We are unable to accept the Government's contention. While deductions are a matter of statutory allowance and are not determined on the basis of equity, yet it is legitimate to assume that Congress intended to provide for a tax on net estates and that, in determining net estates, deductions for debts might be made. It was to avoid the successful presentation of swollen or fictitious claims that the amendments were adopted. Fictitious claims and deductions crept in under the words "claims against the estate." Impositions were still possible under the language of the 1924 act; hence the amendment in 1926. However, in none of the amendments was it specifically required that the said full and adequate consideration should pass to the decedent.

Why insert a further limitation when Congress acted three times to amend the section and left it out? Why add words of limitation when the effect of such addition produces results which do not square with one's sense of fairness? Why impose words of limitation when the language of the statute, literally construed, does not include such limitations?

■■ (2) Was Mitchell's oral promise to pay the bank within the Illinois Statute of Frauds? (Smith-Hurd Ann. St. Ill. c. 59, § 1). The facts in the instant case make this question a close one.

The decisions of the Illinois Supreme Court construing the Illinois statute are binding upon us. That court has repeatedly spoken on this question. Lusk v. Throop, 189 Ill. 127, 59 N. E. 529; Early v. Cassens, 216 Ill. App. 581; Snow v. Schulman, 352 Ill. 63, 185 N. E. 262; Geary v. O'Neil, 73 Ill. 593; Williams v. Corbet, 28 Ill. 262; 25 Ruling Case Law, page 486, § 70.

We do not find that the Illinois decisions announce a rule different from that prevailing in many other jurisdictions. The decision of Howell v. Commissioner (C. C. A.) 69 F.(2d) 447, 450, confirms this statement. That decision deals at length with the test whereby courts may distinguish indemnity promises from surety obligations—between collateral and direct obligations.

We quote therefrom:

"A contract of indemnity is an original undertaking independent of any collateral contract. It creates a primary liability. The promise of the indemnitor is not to answer for the debt, default, or miscarriage of another, but may be to make good the loss resulting from such debt, default, or miscarriage. [Citing cases.] While the object of a guaranty and an indemnity agreement may be the same—to save the promisee from loss—the legal effect is different. One guarantees the performance of an obligation according to its terms. A nonperformance of the obligation constitutes a breach of the guaranty agreement giving rise to the liability of the guarantor. The other indemnifies against loss in case of nonperformance, the failure to perform does not create the liability, and there is no liability until the ascertainment of a loss therefrom. * * *

"Although the ordinary surety or guarantor is a creditor of the principal debtor, the same cannot be true of an indemnitor who does not undertake to assume or discharge the obligations of another, but has, on his own account, contracted to pay a sum of money upon the occurrence of a certain event, usually the happening or the ascertainment of a loss. There is no privity, either actual or implied, between the promisor in the undertaking the loss from the nonperformance of which is indemnified against and the indemnitor, and the latter, if the loss occurs, does not, by payment of it, discharge any one's obligation but his own.

"'The indemnitor is liable only to the indemnitee, and his assigns, and, unless he has stipulated for it, he has no remedy over against the party for whose benefit the contract was made.' Brandt, Suretyship and Guaranty (3d Ed.) vol. I, p. 20."

Arant on Suretyship likewise attempts to clarify the law and to reconcile as well as distinguish the decisions. (Sections 35, 37.) He stresses the importance of distinguishing between indemnity contracts in general and those special indemnity contracts which are to answer for the debt, default or miscarriage of another, a distinction which he points out has not always been made when courts have considered this question.

Our difficulty, however, in this case has not been so much over legal terms or even of ascertaining rules, as it has been to apply the rule announced in the foregoing Illinois decisions to the facts presented in this case —in other words, to ascertain whether the decedent's promise was one where the consideration for it was such that it made him the direct primary debtor of the bank.

The evidence as to decedent's promise is clear and unequivocal. It is uncontradicted. Differences arise only as to inferences to be

drawn therefrom and as to conclusions to be based thereon.

Our conclusion is that the promise was a direct, not a collateral one. It was not to answer for the debt of another. It created a direct obligation of the promisor. It was intended by the promisor and so understood by the promisee that a direct primary obligation should be created.

These two facts induce this conclusion: (a) The indebtedness concerning which the decedent was making a promise had not been created. Its possible creation was the subject matter of the decedent's promise. (b) The bank had previously refused to loan the money to the applicants. It acted only on decedent's promise to repay the loss, if any.

Our conclusion is that the promise was outside of the Statute of Frauds. In reaching this conclusion we have ignored appellees' contention that there was a written document which satisfied the requirement of the Statute of Frauds. We have done so because we could not find in that written document (a pledge of collateral by decedent to secure one of the notes) any promise to answer for the debts of the borrower. The most that might be said of said written document is that the decedent therein requested the bank to loan the money represented by a note (not here involved) for which decedent was pledging as security two hundred shares of stock of Commonwealth Edison. Decedent therein made no promise to pay.

The decree is affirmed.