ESTATE of Matthew I. HEINOLD, Deceased, Virgil W. Heinold, Executor, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 15317.

United States Court of Appeals Seventh Circuit.

June 17, 1966.

John L. Carey, Bruce R. Bancroft, South Bend, Ind., Delmar R. Hoeppner, Valparaiso, Ind., Edward J. Gray, South Bend, Ind., for petitioner.

Richard M. Roberts, Asst. Atty. Gen., Herbert Grossman, Atty., Tax Div., Lee A. Jackson, Gilbert E. Andrews, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before HASTINGS, Chief Judge and KNOCH and CASTLE, Circuit Judges.

KNOCH, Circuit Judge.

The petitioner, Estate of Matthew I. Heinold, deceased, Virgil W. Heinold, Executor, seeks review of a decision of the Tax Court of the United States finding a deficiency in estate taxes, with specific reference to two disputed issues decided adversely to the petitioner.

The Tax Court held that the fair market value of 25,000 shares of stock owned by decedent at his death was $8 per share rather than the value of approximately half that figure placed on the stock by the petitioner's expert witness, and that the proceeds of certain insurance policies on the decedent's life did not qualify for the marital deduction under § 2056 of the Internal Revenue Code of 1954.

The facts are substantially undisputed. The decedent died a resident of Kouts, Indiana, a small rural community whose sole substantial business, the Heinold Elevator Co., Inc., was established as a sole proprietorship by the decedent in 1937. Two years later, the company bought another grain elevator four miles away in Aylesworth, Indiana. After the original building was destroyed by fire in 1942, a new one was built in 1943. In January, 1947, the decedent gave a 25% interest in the company to each of his three children. The company continued as a partnership although a formal partnership agreement was not made until January, 1956. The company expanded its facilities with the aid of a $160,000 loan in 1951 from the Reconstruction Finance Corporation.

In the fall of 1956, the feed mill was destroyed by a second fire, and the bulk of the fire insurance proceeds went to retire the Reconstruction Finance Corporation loan.

A loan of $250,000 from the Small Business Administration was secured. By January, 1958, a new modern mill was built. The company decided to incorporate to secure needed working capital. On May 1, 1958, the new corporation acquired substantially all the assets and assumed all the liabilities of the old company.

Pursuant to an independent appraisal of the company's assets made in April, 1958, the valuation of the fixed assets was written up $343,097.86 above the

company's basis to reflect current appraised market value. Each of the partners received 25,000 shares of $1 par value common stock, and 18,180 shares of this stock were sold to close friends and good customers at $8.50 per share.

In May, 1958, the corporation entered into an underwriting agreement with Northwestern Investment, Inc., which was to use its best efforts to sell up to 50,000 shares within one year after the Indiana Securities Commission's order of approval and to receive 15% of the $10 per share gross selling price.

This public offering was subject to the rights of creditors to apply current indebtedness to stock purchases at $8.65 from June 15 to July 15, 1958. Such creditors' conversions were not expected to exceed $100,000. By July 14, 1958, creditors had bought 4,175 shares at $8.65 per share.

Total sales to the general public for the period July 18, 1958 to June 18, 1959, were 38,712 at $10 per share, involving about 348 transactions and 250 to 300 individuals.

Thus 42,887 of the 50,000 shares offered were sold mostly to purchasers residing in the immediate trading area of the corporation—corporate personnel, their relatives and friends, corporate creditors and customers. By May 15, 1959, a confidential memorandum was issued to department heads of the corporation and to Northwestern that no further stock subscriptions should be accepted after June 15, 1959, as adequate financing had been secured from the sale.

The petitioner feels that these sales provided inadequate basis for determining the fair market value of the stock because the purchasers largely included persons with family or business ties who wished to assist the corporation in raising needed funds and who were furnished only limited data from which the earning power of the business could not be readily estimated.

Each of the salesmen of stock was equipped with a kit to show prospective purchasers. This kit contained parts of the prospectus filed with the Indiana Securities Commission, copy of a magazine article describing the new feed mill, various pictures and descriptions of facilities and employees, financial data on past sales and a projected "Management Estimate" of feed sales for 1958.

The salesmen told prospects that the corporation intended to pay dividends which would provide a 4% return on the offering price of $10. The book value of the stock on May 1, 1958, was $7.71 per share, based on appraised value of the assets. Based on the depreciated original cost basis of the assets, the book value was $4.81 per share.

The petitioner called William E. Stiegelmeyer as an expert witness experienced in the valuation of stocks who spent more than two weeks in his study of this corporation. He used the definition of Fair Market Value, found in Revenue Ruling 59–60: the price at which the property would change hands between a willing buyer and a willing seller, when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of all relevant facts. Mr. Stiegelmeyer evaluated the stock at $3.17.

The fair market value of the stock was a question of fact. The Tax Court's finding of fact as to value must stand unless clearly erroneous. Tripp v. C. I. R., 7 Cir., 1964, 337 F.2d 432, 434. There was substantial evidence to support the Tax Court's finding of the value of the stock. The opinion of an expert witness was material but not conclusive. Fox River Paper Corp. v. United States, 7 Cir., 1948, 165 F.2d 639, 640.

There was only one class of stock. The shares offered to the public were part of the original 200,000 shares as were the shares owned by the decedent. He died in September, 1958. The asserted waiver of dividends on his stock is alleged to have occurred in April, 1961. The evidence shows no pressure on the purchasers to buy the stock, which sold so well that the sale period was cut short by a month.

We conclude that the Tax Court's determination that the value of the stock held by the decedent at the date of his death was $8 per share was not clearly erroneous.

The partnership agreement of January, 1956, provided that (with the exception of the decedent) the partners had secured life insurance policies naming the partnership as beneficiary.

The decedent was insured at his death under three policies, two of which named his wife as beneficiary. The third policy lists as beneficiaries: "The Farmers State Bank of Valparaiso, Indiana, as Assignee and the Insured's wife, Alice M. Heinold, jointly." All three policies were assigned to the Farmers' State Bank as collateral security for the $250,000 Small Business Loan in which the Small Business Administration participated to the extent of 90%, on a loan agreement executed by the four partners. The proceeds of the policies, $36,534.95, when received by the corporation were paid to the Small Business Administration and the Farmers' State Bank on December 16, 1958.

Earlier, on November 11, 1958, the corporation's Board of Directors adopted a resolution that the widow be reimbursed for the proceeds of these insurance policies applied to the corporation's indebtedness.

The amount of the life insurance proceeds was included in the decedent's gross estate and claimed as a marital deduction, which the Tax Court disallowed.

The petitioner views the proceeds of the insurance policies as property passing from the decedent to his surviving spouse, even though the policies were assigned as collateral for a loan by the partnership and the proceeds therefrom were paid to the Small Business Administration and the Farmers' State Bank.

The petitioner reasons that at the decedent's death, a right of present enjoyment of the proceeds of the policy accrued to his widow as named beneficiary, the only incumbrance being the pledge of collateral security. When the proceeds were applied to the indebtedness, the widow became subrogated to the lender's right to enforce a claim against the corporation, so that she received a claim valued at $37,000 rather than $37,000 in cash. The proceeds of the policies, however, did not actually pass to the widow as required by § 2056(a) of the Code. They passed to the corporation and thence to the corporation's creditors.

As the government contends, for the widow to have had rights in subrogation, it must be shown that the decedent intended the widow to be given more than a right to the excess of the proceeds after satisfaction of the indebtedness and that the assignment of the policies as security was subject to an agreement that the widow would have a claim against the corporation if the proceeds were used to satisfy the debt.

In Smith v. Wells, 1919, 72 Ind.App. 29, 41, 122 N.E. 334, an insurance policy was assigned as surety, but the assignment agreement expressly provided that the beneficiaries would be subrogated to the creditor's rights in the mortgaged property.

In Estate of Gwinn, 1955, 25 T.C. 31, on which the petitioner relies, the widow did receive the proceeds of the insurance policy. The estate owed the debt. The debt was in fact paid by the administrator out of other assets of the estate. If the widow had not received the proceeds, she would have been subrogated to the creditor's claim by virtue of the specific provisions of a West Virginia statute.

Apart from such specific statutory provisions, it is recognized that the intention of the insured controls the rights of the parties. Smith v. Coleman, 1945, 184 Va. 259, 271, 35 S.E.2d 107, 160 A.L.R. 1376; Mutual Life Ins. Co. of New York v. Illinois Natl. Bank of Springfield, Ill., D.C., Mich., 1940, 34 F.Supp. 206, 210, afd. Mackie v. Mackie, 6 Cir., 1942, 126 F.2d 469.

In determining the intent of the decedent, it may be noted that one of the policies listed joint beneficiaries: the Farmers' State Bank and the widow.

In assigning another policy, the decedent signed as insured and all four partners signed in behalf of the company in the space for the beneficiary's signature. With respect to the third policy, the decedent again signed as the insured. Alice Heinold and the other three partners signed in the space for beneficiary's signature. The reverse of the assignment states: "Received change of beneficiary February 28, 1957, 3 P.M."

█ Although the partnership agreement of January 12, 1956, (that the partnership would be beneficiary on the life insurance policies taken out by the partners) did not include the deceased in that agreement, his son's testimony would support a reasonable inference that the decedent nevertheless intended his policies also to be committed to the partnership. The son testified that all the policies, including his father's were taken out to allow the partners to buy out the interest of a deceased partner. The inclusion of the bank as beneficiary on one policy and the stated change of beneficiary on another policy also bolster the Tax Court's finding that the widow was not intended to be the primary beneficiary. Certainly there was no showing that any agreement was made during the decedent's lifetime for compensation to the widow by the corporation. The resolution of the corporation after his death does not establish an enforceable claim at the date of his death. We must agree with the Tax Court that the proceeds of the policies did not pass to the widow, nor did she acquire an enforceable claim to them.

█ Alternatively, the petitioner argues here that the amount of the indebtedness paid is allowable as a deduction from the gross estate as a bona fide claim enforceable against the estate. This issue has not been timely raised, Rule 50(c) Rules of Practice, Tax Court of the United States. But, in any event, the indebtedness was incurred by the corporation and the satisfaction of that indebtedness out of the insurance proceeds distributed part of the estate for the benefit of the corporation—not in satisfaction of an obligation of the estate. See United States v. Mitchell, 7 Cir., 1934, 74 F.2d 571, 573, where this Court said "only enforceable claims against the estate may be deducted."

The decision of the Tax Court is affirmed.

Affirmed.