LARRY VILLARREAL, Plaintiff-Appellant, v. METROPOLITAN BANK
AND TRUST COMPANY, Successor to and f/k/a Civic Federal Savings
Bank, Defendant-Appellee.

First District (3rd Division)   No. 1—93—3372

Opinion filed December 20, 1995.

George B. Collins, Christopher Bargione, and Paula M. Uscian, all of
Collins & Bargione, of Chicago, for appellant.

George D. Karcazes and Gary E. Green, both of Martin & Karcazes, of
Chicago, for appellee.

JUSTICE RIZZI delivered the opinion of the court:

Plaintiff, Larry Villarreal, brought this suit to recover damages for breach of an oral contract entered into between him and Civic Federal Savings Bank, a Federal savings bank, and based upon a cause of action arising from 12 C.F.R. § 545.121(b) (1995). Defendant, Metropolitan Bank & Trust Company, is the successor to Civic Savings Bank; hereafter, Civic Federal Savings Bank and Metropolitan Bank & Trust Company shall be referred to jointly as the Bank. The Bank filed a section 2—619(a)(7) and (a)(9) motion to dismiss on the bases that the alleged contract is unenforceable under the provisions of the statute of frauds and that it is unenforceable because it lacks consideration. (735 ILCS 5/2—619(a)(7), (a)(9) (West 1992).) The trial court granted the Bank's motion and dismissed the case with prejudice. We reverse and remand.

The Bank is regulated by the United States Office of Thrift Supervision. Villarreal was the chief executive officer, chairman of the board, and president of the Bank, which is located in Chicago, Illinois. Another Bank officer, Lawrence Kelliher, allegedly committed certain crimes, including bank fraud. There was an investigation of Kelliher by the United States Office of Thrift Supervision, which involved all officers of the Bank, including Villarreal, who is related to Kelliher.

Under the circumstances, on May 7, 1990, Villarreal was asked by the Bank to withdraw as chief executive officer of the Bank, pending a resolution of the investigation that arose from the actions of Kelliher. Also, on May 7, 1990, there was an oral agreement between Villarreal and the board of directors of the Bank that if he withdrew, he would be indemnified and reimbursed for any investigation expenses and legal fees incurred by him in the matter of his own defense arising from his service as the chief executive officer and director of the Bank.

In addition, Villarreal alleges in the complaint that on May 7, 1990, there was an oral agreement between Villarreal and the Bank which provided:

"Plaintiff would withdraw as Chief Executive Officer of Civic Federal pending a resolution of the legal problems that arose from the actions of Kelliher. In exchange for withdrawing as Chief Executive Officer of Civic Federal, Civic Federal would pay to Plaintiff his salary from the time he withdrew as Chief Executive Officer until it was determined whether or not any action would be taken against the Plaintiff. However, if any action was taken against the Plaintiff by any governmental agency as a result of his actions as Chief Executive Officer, then Civic Federal would

not be required to pay Plaintiff his salary from the time he withdrew as Chief Executive Officer until it was determined whether or not any action would be taken against the Plaintiff."

On May 7, 1990, Villarreal withdrew as chief executive officer of the Bank. Thereafter, Villarreal incurred investigation and legal expenses of $30,323.03 in connection with the Kelliher investigation, by reason of his having been the president and chief executive officer of the Bank during the period that was involved in the investigation.

Although Villarreal was under investigation in the Kelliher matter, no formal action was ever taken against Villarreal by any governmental agency as a result of his actions or conduct with the Bank. As a result, on December 17, 1991, the board of directors authorized payment of $30,323.03 to Villarreal for his investigation expenses and legal fees, and payment of $120,416.61 for 17 months' lost wages; in 1990, Villarreal's salary was $85,000 per year. On the same day, December 17, 1991, the board of directors of the Bank notified the United States Office of Thrift Supervision in writing of its intent to pay the $30,323.03 and $120,416.61 to Villarreal. The Bank's December 17, 1991, letter provides:

"*Indemnification*

It is proposed that indemnification would be made in accordance with the Agreement attached hereto and incorporated herein by reference which provides (a) the payment of $120,416.61 which represents 17 months' salary (calculated on the salary in place on May 7, 1990); (b) $1,000.00 which represents the pro rata portion of the profit realized by the Association on the sale of a 1987 Mercedes Benz; and (c) reimbursement and legal fees in the aggregate amount of $30,323.03.

*Corporation Resolutions*

Appended hereto and incorporated herein by this reference is a Certificate of Corporate Secretary attesting to the action taken by the board of directors of Civic at its regular meeting held December 16, 1991 approving this submission and authorizing the payment under the agreement subject to the requirements of the above-referenced regulation.

I trust that you will find this notification and attachments hereto in conformance with the requirements of your office."

In addition, on March 31, 1992, the board of directors of the Bank approved a resolution agreeing to reimburse Villarreal for the $30,323.03 as his investigation expenses and legal fees. On April 2, 1992, the Bank notified the United States Office of Thrift Supervision of its intent to pay the $30,323.03 to Villarreal as his investigation expenses and legal fees. On May 7, 1992, the United States Office of Thrift Supervision sent a response letter to the board of directors of the Bank, which provides as follows:

"RE: Notification pursuant to section 545.121(c) of the OTS Regulations

Dear Members of the Board:

This letter is in reference to Civic Federal Savings Bank's ('Civic') December 17, 1992 Notification of Indemnification to reimburse Mr. Larry Villarreal's legal expenses. This Office deemed the Notice complete on March 30, 1992. The legal expenses relate to criminal and civil investigations of Mr. Villarreal's activities while he served as a chairman of the board and president of Civic. As part of the notification process, the board assured this Office in its February 24, 1992, letter that it would not reimburse Mr. Villarreal until the institution is recapitalized.

Based on the information provided, we have no objection to Civic paying the indemnification to Mr. Villarreal pursuant to the terms of the amended Indemnification Agreement submitted with your Notice. We do not object to the reimbursement of Mr. Villarreal for the payment of legal expenses to the following firms.

| Legal Firms | Amount | Purpose |
|---|---|---|
| Collins & Bargione | $ 3,460.00 | Civil Defenses |
| Coffield, Ungaretti, Harris & Slavin | $11,224.15 | Civil Defenses |
| Coffield, Ungaretti, Harris & Slavin | $15,598.88 | Criminal Defenses |
| Total | $30,283.03." | |

Despite the circumstances which we have described, including the agreements that the Bank made with Villarreal on May 7, 1990, the Bank refused to pay Villarreal the $30,323.03 for investigation expenses and legal fees, and it refused to pay him the $120,416.61 for 17 months' lost wages. This lawsuit ensued.

In granting the Bank's motion to dismiss, the trial court stated that the May 7, 1990, agreements were barred by the Frauds Act (Statute of Frauds) (740 ILCS 80/1 (West 1992)), and that there was no consideration given for the agreements. The Bank argues that the trial court properly "held that the alleged oral agreement was a purported agreement to indemnify plaintiff for an obligation that had arisen as a result of his prior activities, not an indemnity of a new situation and thus not a new and independent obligation." The Bank continues its argument by claiming: "More importantly, the trial court ruled there was no consideration since the defendant received no benefit from this alleged oral agreement."

The record manifests that the trial court erred in granting the Bank's motion to dismiss. It also manifests that the Bank's argument is untenable. Plainly, the agreements between Villarreal and the

Bank do not implicate the Statute of Frauds, and there was consideration for the agreements.

■ The provision of the Statute of Frauds upon which the Bank's motion to dismiss is based states:

"No action shall be brought, whereby to charge any executor or administrator upon any special promise to answer any debt or damages out of his own estate, or whereby to charge the defendant upon any special promise to answer for the debt, default or miscarriage of another person, or to charge any person upon any agreement made upon consideration of marriage, or upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized." 740 ILCS 80/1 (West 1992).

■ It is well established that only a collateral promise is a special promise within the meaning of the Statute of Frauds. An original or independent promise is not a special promise under the statute. (See *Ricci v. Reed* (1988), 169 Ill. App. 3d 1062, 1066, 523 N.E.2d 1218, 1221.) A promise of indemnity, as is involved in the present case, is an original and independent promise. More specifically, a promise of indemnity is not a collateral promise to answer for the debt, default, or miscarriage of another. See *United States v. Mitchell* (7th Cir. 1934), 74 F.2d 571.

■ The Bank's promise of indemnity in the present case was therefore not a special promise within the purview of the Statute of Frauds. Rather, the Bank's promise of indemnity was an original and independent promise to Villarreal that is outside the Statute of Frauds.

In addition, there was sufficient consideration for the agreements in this case to satisfy the requirements of a contract because the agreements were based on an exchange of promises. (See *McAdams v. Scullin* (1977), 53 Ill. App. 3d 374, 379, 368 N.E.2d 1036, 1039.) The Bank promised to indemnify and reimburse Villarreal for his investigation expenses and legal fees, and to pay him the sum of his salary pending the outcome of the Kelliher investigation. In exchange for the Bank's promise, Villarreal promised to withdraw as chief executive officer and president of the Bank pending the resolution of the Kelliher investigation.

The Bank contends that the "plaintiff was suspended as Chief Executive Officer against his desire and did not withdraw as Chief Executive Officer" in consideration for the oral agreement to indemnify

and that, therefore, "the alleged oral contract is unenforceable as a matter of law for lack of consideration." The Bank's contention, however, is belied by the December 17, 1991, letter from the board of directors of the Bank to the United States Office of Thrift Supervision.

In the December 17, 1991, letter, the Bank states that the board of directors is notifying the United States Office of Thrift Supervision of its intention to indemnify Villarreal for the payment of $120,416.61, which represents 17 months' salary, and of its intention to reimburse him for investigation expenses and legal fees in the aggregate amount of $30,323.03. We therefore reject the Bank's contention. Under all the circumstances, the record establishes that Villarreal withdrew as chief executive officer of the Bank.

Although it was not raised in the Bank's motion to dismiss, Villarreal raised and argued in the trial court and on appeal the issue of his alleged cause of action based on 12 C.F.R. § 545.121(b) (1995). The trial court agreed with the Bank that Villarreal does not have a cause of action based on 12 C.F.R. § 545.121(b) (1995) because no final judgment was entered in his favor. We agree.

The relevant provision of 12 C.F.R. § 545.121(b) provides that "a savings association shall indemnify any person against whom an action is brought or threatened because that person is or was a director, officer, or employee of the association, for" reasonable "costs and expenses, including reasonable attorney's fees, actually paid or incurred by that person in defending or settling such action, or in enforcing his or her rights under this section if he or she attains a favorable judgment in such enforcement action." 12 C.F.R. § 545.121(b)(2) (1995).

Thus, the plain language of the regulation requires that a director, officer, or employee of a savings association attain a favorable judgment in such enforcement action before a cause of action for indemnity is created pursuant to the regulation. The regulation defines a final judgment as follows: "The term 'final judgment' means a judgment, decree, or order which is not appealable or as to which the period for appeal has expired with no appeal taken." 12 C.F.R. § 545.121(a)(iii) (1995).

In the present case, although Villarreal was under investigation and an action was threatened, Villarreal concedes that no final judgment was entered in any action against him. It follows that no cause of action is created in this case by virtue of the regulation.

Accordingly, the order granting the Bank's motion to dismiss is reversed. The Bank's motion to dismiss is denied; the plaintiff's alleged cause of action based on 12 C.F.R. § 545.121(b) (1995) is stricken

194

and dismissed. The case is remanded for further proceedings consistent with what is stated herein.

Reversed and remanded.

GREIMAN, P.J., and TULLY, J., concur.