Estate of Everett Otte, Deceased, Lura C. Otte, Executrix v. Commissioner.
Estate of Otte v. Commissioner
Docket No. 187-70.
United States Tax Court
T.C. Memo 1972-76; 1972 Tax Ct. Memo LEXIS 180; 31 T.C.M. (CCH) 301; T.C.M. (RIA) 72076; March 28, 1972, Filed. *180 Petitioner was married to decedent for 35 years and during this period they purchased several parcels of real estate in Indiana as tenants by the entireties. Under Indiana law, income from such property belongs to spouses in equal shares, and each spouse is considered to have paid from his or her separate funds one-half of the cost of any property acquired through investment of the income from such property. In addition to contributing her share of the income from jointly owned realty to acquire more property from 1932 until decedent's demise in 1967, decedent and petitioner working as a "husband and wife team" each contributed their services in managing and operating their farming enterprise. They pooled all of their earnings from such activity and substantially all of the real and personal property purchased during their marriage was acquired by borrowing the entire amount and then paying it back over the years out of the farm earnings and rents. On June 28, 1966, decedent transferred three parcels of realty held as tenants by the entireties to petitioner. He died October 10, 1967. Held, (1) one-half of all the property, real and personal, included in decedent's gross estate by *181 respondent is excluded in computing his taxable estate under sec. 2040, I.R.C. 1954 June 28, 1966, by decedent was not in contemplation of death within the purview of sec. 2035; and (3) the Crider land transferred to petitioner on June 28, 1966, is not includable in decedent's gross estate under sec. 2036. Elmer E. Lyon, 600 Circle Tower, Indianapolis, Ind., and,paul J. Corsaro, for the petitioner. James J. McGrath, for the respondent. WITHEY
Memoradum Findings of Fact and Opinion WITHEY, Judge: A deficiency in estate tax has been determined by the Commissioner against petitioner in the amount of $7,943.44. Decedent Everett Otte died October 10, 1967. The issues for our consideration are: (1) whether none of the real and personal property items reported on the estate tax 302 return originally belonged under section 2040[1] *182 of the Code of 1954 to the surviving spouse except to the extent admitted by respondent; (2) whether the transfer of real estate on June 28, 1966, by the decedent was in contemplation of death within the meaning of section 2035; and (3) whether the parcel of real estate known as the Crider land is includable in decedent's gross estate under section 2036. Respondent concedes that the Oliver 66 tractor acquired in 1951 with Lura Otte's inheritance reported on the estate tax return is excludable under section 2040. Respondent determined that the three parcels transferred to petitioner on June 28, 1966, were includable in decedent's gross estate under section 2036. Respondent concedes that section 2036 does not apply to the Robertson or Fountain lands. Respondent determined that the parcels transferred on June 28, 1966, were includable under section 2035 or 2036 at their full value on the date of death. Respondent concedes that under either 2035 or 2036, only one-half of their value is includable. Findings of Fact Some of the facts have been stipulated and are so found and incorporated herein by this reference. Lura C. Otte, executrix (hereinafter sometimes called petitioner), is the duly qualified executrix of the estate of Everett H. Otte, deceased, with her principal office and residence in Seymour, Indiana. The return for the estate here involved was filed with the district director of internal revenue for the district of Indiana. Petitioner *183 is the surviving spouse of Everett Otte, deceased. The Ottes were married July 17, 1932. On June 2, 1932 (several weeks before his marriage), decedent purchased a 105.64acre tract of real estate for $9,000. This parcel of land is sometimes referred to as the "homeplace." He made a part payment on the purchase price and assumed a mortgage in favor of the Federal Land Bank of Louisville. This real estate was reconveyed to decedent and petitioner on April 30, 1958, as tenants by the entirety and was so held until his death on October 10, 1967. This property had a date-of-death value of $44,997. In 1937 decedent and petitioner purchased a tract of real estate comprising approximately 75 acres as thenants by the entirety for $1,600. They borrowed the money from the Jackson County Bank. Petitioner and decedent paid the bank out of their joint earnings and rents from the farm operation. This property is referred to as the Clay Farm and had a date-of-death value of $15,400. In 1940 decedent and petitioner purchased 25 acres of land as tenants by the entirety for a total consideration of $2,500. Petitioner and decedent borrowed $2,500 from a Federal Land Bank and repaid the loan from farm rents *184 and profits. This tract (sometimes also called the "homeplace") had a fair market value on the date of death of $10,625. In 1942 petitioner and decednt purchased 60 acres of land known as the Robertson Tract for about $6,000. Title was taken in decedent's name alone. Decedent assumed a mortgage at Citizens State Bank of Brownstown and petitioner and decedent gave the seller their promissory note for $2,650 secured by a mortgage. The entire mortgage balances and down payments were made and paid from farm income. In 1946, 20 of the 60 acres of the Robertson tract were sold for $2,000 and the proceeds reinvested in another purchase of real estate known as the Fountain land. The remaining 40 acres were conveyed by decedent to petitioner on June 28, 1966. In 1946 decedent and petitioner purchased 100 acres of land, sometimes known as the Fountain land, as tenants by the entirety for $10,000. Petitioner and decedent paid the purchase price with $2,000 obtained from the sale of part of the Robertson land and the balance was borrowed rom the bank. Decedent transferred his interest in this real estate to petitioner on June 28, 1966. In 1947 a parcel of land comprising approximately 20 acres *185 was acquired by Everett and Lura C. Otte as tenants by the entirety. The purchase price was about $800. Decedent inherited a one-quarter interest in the land from his father. Decedent and petitioner used earnings from 303 their farm income to pay off three heirs (tow brothers and a sister of decedent) who had a three-fourths interest in this land. In 1950 decedent and petitioner as tenants by the entirety purchased for $15,500 a tract of land comprising approximately 184 acres, referred to as the Muscatatuck Farm. The purchase price was borrowed from the Jackson County Loan and Trust Company and repaid from farm earnings. This property had a fair market value at the date of death of $36,000. On April 30, 1958, the parcel of land owned by Everett Otte (sometimes referred to as the homeplace comprising approximately 105 acres) was transferred to Everett and Lura C. Otte as tenants by the entirety. In 1963 decedent, petitioner, and their son Ronald Otte purchased the Crider Farm for $60,500. The total amount of acreage involved was 335 acres. Decedent and petitioner's part of the purchase price was $25,000. After the purchase, the real estate was partitioned, decedent and Lura retained *186 120 acres by deed as tenants by the entirety, and Ronald took the balance of the 335 acres. In order to raise part of the purchase price, decedent and petitioner in 1963 sold 35 acres from the Clay Farm for $14,000 and the balance was borrowed jointly by decedent and petitioner from the Jackson County Bank. The amount of the note due the bank after the partition was $13,000. This note was paid off from the proceeds of an endowment life insurance policy on the life of decedent which had been taken out in 1944. The premiums on these policies were paid each year from the sale of eggs and of hens raised by petitioner. From the time Lura and decedent were married in July 1932 until about 1965, her activities on the "homeplace" were more extensive than those of an ordinary housewife not residing on a farm. Petitioner took care of the chickens and the egg production. Also she took an active part in the care of the livestock, including the milking of the cows. When Everett would be away working the "bottoms" or the other farms, she assumed full responsibility for the care of the livestock. Lura and decedent produced certified feed and in the process she picked out the odd kernels, took orders, *187 and helped deliver the feed. Lura also set out the tomato plants and cabbages and helped pick the crop. Frequently she drove the truck to town to pick up the feed for the farm. She took care of most of the financial affairs, including the farm records connected with the farming operation. Lura kept in touch with news which would influence the farm market and studied the daily accounts of the market to determine the best day to sell hogs. During the years they farmed with horses, Lura, among other things, would harrow and disc; helped to plant crops; and used the horses to pull hay into the farm. Lura and Everett had five children, Lois age 36, Dorothy 35, Thelma 32, Ronald 29, and Richard 27. On June 28, 1966, decedent executed his will and on the same date he conveyed his interest in the following parcels of real estate to Lura, thereby terminating estates by the entirety and giving Lura sole ownership: (1) Approximately 40 acres acquired in 1942, sometimes referred to as the Robertson land; (2) Approximately 100 acres acquired in 1946, sometimes referred to as the Fountain land; and (3) Approximately 120 acres acquired in 1963, sometimes referred to as the Crider land. The following *188 parcels of real estate were included on the estate tax return as filed as part of Schedule E, Jointly Owned Property: (8) Two parcels of real estate ap- proximately 105 and 25 acres, sometimes referred to as the homeplace and part of the
homeplace, respectively
50,200
(9) Approximately 25 acres acquired in 1947
500
(10) Approximately 40 acres, some- times referred to as the Clay Farm
15,400
(11) Approximately 184 acres, some- times referred to as the Musca- tatuck farm
32,000
The following personal property items were included on the estate tax return as filed as part of Schedule E. Jointly Owned Property: (1) Checking account
$7,209.17
(2) Certificate of deposit
6,000.00
(3) Savings account
3,000.00
(4) Farm Bureau Stock
500.00
(5) 1964 Buick
965.00
(6) U.S. Savings Bonds
1,512.80
(7) Stock
250.00
The following items were included on the estate tax return as filed on Schedule F, Other Miscellaneous Property: 304 1.
1967 New Idea cornpicker
$2,000.00
2.
1964 Oliver combine - 525
3.400.00
3.
1966 Oliver tractor & plow 1850, 2/3 int.
3,360.00
4.
1963 Oliver tractor 1600, 2/3 int.
1,600.00
5.
1951 Oliver 66 tractor
75.00
6.
1965 Oliver Corn planter, 2/3 int.
265.00
7.
1963 Rotary hoe
75.00
8.
1966 Hay rake, 1/2 int.
150.00
9.
1966 Elevator, 1/2 int.
150.00
10.
1953 wheat drill, John Deere
50.00
11.
1967 Kewanee disc, 1/2 int.
300.00
12.
1962 harrow
25.00
13.
1966 hay mower
200.00
14.
1961 rotary mower
60.00
15.
1965 manure spreader, 1/2 int.
200.00
16.
2-1965 wagons
400.00
17.
1957 bulk tank and milker
75.00
18.
1965 weed sprayer, 1/2 int.
50.00
19.
1965 Chevrolet truck, 3/4 ton, 6 cyl.
1,100.00
20.
1967 hay conditioner, 1/2 int.
150.00
21.
1964 cultivator, 2/3 int.
360.00
22.
1956 combine
35.00
23.
small hand tools
100.00
24.
Cert. of membership, Lutheran Resort Assn., Inc.,
entitling owner to use of lot 23
500.00
25.
1966 crop of wheat, 1713 bu. at $1.25 per bu.,
value - less 31" storage due Oct. 1967
1,610.22
26.
1967 wheat crop, 608 bu. at $1.25 value -
less 8" storage due Oct. 1967
711.36
27.
1966 ears corn in crib, 3,000 bu. at 88" per
bu.
2,640.00
28.
1967 soybeans, 260 bu. plus 30 bu. for seed
672.80
29.
1967 clover seed, 1520 1bs. at 19" per 1b.
288.80
30.
1967 hay, 3/4 int. in 2600 bales
675.00
31.
1967 straw, 400 bu. at 22-1/2" per bale
90.00
32.
Wheat in bin, for feed (150 bu. w/weavil in it)
100.00
33.
Milk cows - 30
5,700.00
34.
Sows & gilts - 17
1,045.00
35.
Sows with pigs (10 sows, 84 pigs)
1,156.00
36.
1 boar
50.00
37.
3 steers, average 350-400 1bs.
180.00
38.
1 heifer
135.00
39.
77 shoats at $25.50
1,963.00
40.
31 fat hogs
1,153.99
*189 305 During 1951, petitioner received $2,170 from her mother's estate. Of this inheritance, $1,600 was used to purchase an Oliver 66 tractor which is included as item 5 in Schedule F of decedent's Federal estate tax return and $500 was used to install a water system and bath in the house on the Muscatatuck Farm. All farm inventory, crops, and livestock included in the decedent's Federal estate tax return were raised on the farm of decedent and petitioner and were acquired after 1958. The following parcels of real estate transferred June 28, 1966, were not included on the estate tax return as jointly owned property: (1) Approximately 40 acres sometimes referred to as the Robertson land. (2) Approximately 100 acres sometimes referred to as the Fountain land. (3) Approximately 120 acres sometimes referred to as the Crider land. On Schedule G of the estate tax return, Transfers During Decedent's Life, the transfer of real estate on June 28, 1966, is set out and the motive which actuated decedent in making the transfer is described as "Estate Planning." At the time of the transfer of real estate on June 28, 1966, deceased was 61 years of age and in excellent health. He had never had any *190 serious illness or medical care of any kind prior thereto. At the time of the transfer, he had no knowledge of any health difficulties of any sort. The deceased died of a cerebral hemorrhage on October 10, 1967. His death was sudden and unexpected, both by him and his family. Throughout his life, deceased was active in community affairs and at the time of his death was on the Stewardship Board of the Zion Lutheran Church of Seymour, Indiana, and was also a member of the Muscatatuck Water Shed Board. Prior to his death, deceased had been an active bowler and had signed up for the bowling league with the Zion Lutheran Church for the winter of 1967-1968. He farmed continuously up to the time of his death. He was active in numerous farm organizations. In September of 1966, deceased took a three-week trip to Russia. This trip was part of a farm exchange program sponsored by the United States. Everett was committed to the trip at the time the transfer of real estate was made and was desirous of completing the transfer prior thereto. The deceased had attended farm bureau lectures in regard to estate planning and was aware of the consequences of Federal estate tax. The transfer of the real *191 estate on June 28, 1966, to Lura was made on the advice of decedent's attorney. Petitioner signed an affidavit in support of Schedule G of decedent's Federal estate tax return which states that the purpose of the deceased's transfer on June 28, 1966, was to carry out an estate plan intending to avoid Federal death taxes, to compensate his wife Lura for her services and expenditures in the accumulation of their property, to give Lura experience in the management of real estate, and in part to escape the burden of managing the property transferred. Deceased was the joint owner of a considerable amount of real estate and was aware of the increasing value thereof as a result of inflation. Ultimate Findings of Fact Working as a "husband-wife team," petitioner contributed an adequate and full consideration in money or money's worth in the acquisition of her one-half interest in all of the real and personal property enumerated in decedent's Federal estate tax return and included in the latter's taxable gross estate. The transfer of all of decedent's interest in three parcels of real estate to petitioner on June 28, 1966, was not in contemplation of death within the purview of section 2035 *192 of the 1954 Code. Opinion I. Joint Interests, Section 2040 Respondent determined that none of the real and personal property reported on the decedent's estate tax return originally belonged to the surviving spouse under section 2040 of the 1954 Code [2] except to 306 the extent admitted by respondent. Petitioner, in opposition, contends that she made a substantial contribution of money or money's worth to the acquisition of all property included in decedent's gross estate and accordingly, one-half thereof should be excluded from decednt's gross estate in computing the taxable estate pursuant to section 2040, supra. Further, petitioner urges that if respondent properly gave her credit for such contributions, decedent's gross estate would be nontaxable, resulting in an overpayment and refund of tax to the estate in the amount of $1,870.29. Essentially, it is petitioner's position that from the date of their marriage in 1932, until decedent's demise on October 10, 1967, decedent and Lura participated in the overall farming operations; pooled all their earnings and rents from such activity; and purchased and paid for substantially all of the real and personal property in controversy with *193 such profits. It is axiomatic that petitioner in order to prevail must prove the fact and amount of any part of the value of the assets in question excludable in computing the value of the gross estate of decedent. Accordingly, the evidence must show that Lura furnished some certain proportionate part of the consideration with which a piece of property was purchased or that she acquired an interest in certain property from the decedent by paying the full and adequate consideration in money or money's worth for what she received. Phillips v. Dime Trust & S.D. Co., 284 U.S. 160, 167 (1931). *194 Considering all the affirmative evidence of record, including petitioner's testimony which was worthy of belief, we find that she has met her burden. Examination of the several warranty deeds in evidence show that the real estate in question (except the 105.64 acres known as the "homeplace") was conveyed to decedent and Lura as husband and wife, and that they both became seized of the property. In the State of Indiana, a conveyance made to a husband and wife without defining the estate, as here, creates an estate of entirety. Richards v. Richards, 60 Ind. App. 34, 110 N.E. 103. LeRoy v. Wood 113 Ind. App. 397, 47 N.E. 2d 604; Finney v. Brandon, 78 Ind. App. 450, 135 N.E. 10. Likewise in Indiana, income from property held in a tenancy by the entirety belongs to the spouses in equal shares (see Burns' Anno. Ind. Stats., par. 56-112, 1951), and therefore, for that purpose each spouse is considered to have paid from his or her separate funds one-half of the cost of any property acquired through investment of the income from such property. [3] See I.T. 3898, 1948-1 C.B. 55; Rev. Rul. 56-519, 1956-2 C.B. 123; Rev. Rul. 58-130, 1958- C.B. 342, relating specifically to a taxpayer in Indiana *195 who derived income from property held in tenancy by the entireties. Relying on this Indiana statute and respondent's rulings, petitioner avers that as a tenant by the entirety she is entitled to one-half of the earnings from such property; that this income was the source of funds used to acquire half of the various items on the estate tax return; and hence, that half of such items are excludable under section 2040, supra. Although respondent admits that under Indiana law each tenant by the entirety is entitled to one-half of the income from such property, he maintains that the record does not support petitioner's contention that she made substantial contributions to the acquisition of estate assets, except to the extent he has conceded. Respondent contends that prior to April 30, 1958, the amount of income from entirety property belonging to Lura is "unascertainable," and that there is no evidence of dates or amounts of any payments on loans incurred to purchase real estate prior to 1958 which is included in decedent's gross estate as jointly owned property. Regarding various items of personal property acquired after April 30, 1958, respondent contends further that the use of funds *196 belonging to Lura cannot be presumed, and that the difficulty in demonstrating the application of funds does not alter her burden. We do not believe that the documents of transfer, including the underlying mortgages and promissory notes with respect to the real estate under review, represent the creation of a purely legalistic title in the spouses as tenants by the entirety, as respondent avers. Analysis of the record shows that from the date of their marriage in 1932 until decedent's death in 1967, decedent and petitioner working as a "husband and wife team" each contributed their services in managing and operating their farming enterprises and pooled all of their 307 earnings from such activity in order to purchase a substantial amount of real and personal property. Virtually all of the property in controversy was acquired over the years by borrowing the *197 entire amount and then paying it back over the years out of the farm earnings. The purchase price of all the real estate was made from their joint contribution except for the down payment on the 105.64-acre tract acquired by decedent in 1932 shortly prior to their marriage. During their marriage, each of them joined in borrowing money for the purpose of operating their farming enterprises. At the time of each purchase of real estate, each of them gave their note and mortgage jointly and severally. The purchase money mortgages placed on the properties in question were paid off from the rents and profits of such properties. It is clear that petitioner's and decedent's source of income was from the rents and profits from their farming operations and from interest income from savings accounts and other income investments they had made from their farm earnings. All machinery, household furniture, equipment, and farm inventory were purchased or acquired from their joint earnings. We reject respondent's contention that the 105.64 acres (known as the "homeplace") owned by decedent alone from 1932 to April 30, 1958, represented a very substantial part of decedent's and Lura's farming operations, *198 and is includable in full in decedent's gross estate. Where separate property, as here, is brought by one spouse to the marriage, joint contribution toward the maintenance and preservation of that property creates a joint interest therein, including the income derived therefrom. See Ernest H. Mills, 54 T.C. 608, 616 (1970), affd. 442 F. 2d 1149 (C.A. 10, 1971). The record shows that decedent and Lura owned jointly 44 acres of land. The 105.64-acre homeplace represented only about 19 percent of the total acres under joint ownership of decedent and his wife prior to April 30, 1958, and the 105.64 acres did not represent a significant amount of the income-producing property. Several weeks before his marriage to Lura in 1932, decedent purchased the homeplace for $9,000 with a small down payment and gave a mortgage back to secure the repayment thereof. Petitioner worked with decedent and contributed her services toward the payment of the mortgage balance. This property was subsequently reconveyed to them jointly as husband and wife in 1958. We are persuaded that the continuing contribution of Lura's services, industry, and skills during the 35 years of marriage helped substantially to *199 preserve and increase the values of the homeplace property. Her varied activities in the overall operation of the farming enterprise at the homeplace, as reflected in our findings, represent "money's worth" in the production of the joint income used to acquire equipment and other assets used on this property, and contributed significantly to the enhanced value of the homeplace. Although the homeplace was held by decedent in his own name until 1958, we believe the enhanced value of the homeplace resulting from decedent's and Lura's efforts working together as a "team" constitutes jointly acquired property subject to equal division for estate tax purposes. In view of the foregoing and bearing in mind that the homeplace was acquired in 1932, apparently with a small down payment, we hold that one-half of its value is includable in decedent's gross estate under section 2040, supra. See Ernest H. Mills, supra. With respect to the other real and personal property in dispute, the evidence is clear that Lura's efforts, industry, and skills were not limited to those of an ordinary housewife and contributed to the success and growth of the overall farming operation. Lura's activities during *200 the years of her marriage to decedent were more extensive than those of the ordinary housewife not residing on a farm. While her activities may not have been as extensive as Everett's, she nonetheless was an important auxiliary to her husband in the conduct of his farming operations. On the whole, the contributions made by Lura as an active "farm wife" were far in excess of those of a housewife discharging ordinary domestic responsibilities and in our opinion such activity fairly justifies a division of the property accumulated during her marriage to decedent for estate tax purposes within the purview of section 2040, supra. We are aware that absolute certainty as to the source of the particular funds used to purchase a particular parcel of realty or an item of personal property is difficult, but we also believe that it would be harsh and unrealistic to hold that petitioner must trace the funds earmarked to purchase each of the assets in dispute. We have carefully considered petitioner's exhibits 308 summarizing all of the earnings and expenses of decedent and his wife from all their sources of income from 1934 through 1967. Petitioner testified that she and her husband pooled all *201 their funds and income and used this income to create the property which was included in decedent's gross estate. Suffice it to say Lura's testimony was convincing and we do not subscribe to the narrow view of respondent that her exact money contribution must be traced with exactitude through each change in property. The evidence is clear that all available funds arising from the joint efforts of the parties were invested in the property in controversy. To such proceeds were added petitioner's inheritance from her parents' estate. In the management of those assets, a business activity in many respects, the wife took a substantial part and we find that they intended to share equally in the results of their endeavors and the consequent profits therefrom. We believe that section 2040, supra, considered in its most liberal aspects as to respondent, is met by the evidence which shows convincingly that petitioner's contributions represented "an adequate and full consideration in money or money's worth." Richardson v. Helvering, 80 F. 2d 548 (C.A.D.C. 1935); Max German, 2 T.C. 474, 481 (1943). Since the facts show that virtually all the personal property, tangible and intangible, reported *202 as assets in the estate tax return was acquired from earinings after 1958, we hold that one-half the value of such tangible and intangible personal property should be excluded from decedent's gross estate as property belonging to Lura. There has been erroneously included in the gross estate the entire value of harvested crops, livestock, and timber sales, all of which wer grown and harvested from the joint properties. Only one-half of the value of such property is to be included. In the Federal estate tax return all the farm equipment is designated by make and model number indicating the year of purchase. Practically all of this property was purchased after 1958 from earnings that were unquestionably joint earnings after that date and only one-half of such property is to be included in the gross estate. In Schedule B. Item 5, there was included 1,668 shares of the common stock of the Jackson County Farm Bureau Cooperative. These shares were registered and transferred to Everett as rebates on sales and purchases that he and petitioner had made in connection with their joint farming operations. To the extent they rose out of the joint tenancy operation, only one-half the value of such *203 shares is to be included in decedent's gross estate. Furthermore, we believe the evidence shows that all the property included in the gross estate was acquired from joint earnings, even though some of it may have been in decedent's name alone and that, therefore, only one-half the value of any such items, including the household goods that respondent has included, is to be excluded from decedent's taxable estate. II. Transfers in Contemplation of Death, Section 2035 Respondent determined that the transfer of all of decedent's interest in three parcels of real estate to petitioner on June 28, 1966, was in contemplation of death within the meaning of section 2035 of the 1954 Code. [4] *205 Prior to that time these parcels were held in tenancy by the entireties. On the same day, decedent executed his will. Decedent died within three years of the transfer. The transfer is referred to on Schedule G of the estate tax return and the motive which actuated the decedent in making the transfer is described as "Estate Planning." Respondent now concedes that only one-half of the value of the transfers should be included in decedent's gross 309 estate, but that the other half should be included under sections 2035 *204 and 2036. [5] It is respondent's position that motives associated with death dominated decedent's conveyance to Lura; these motives were a desire to avoid estate taxes and to substitute for a testamentary disposition. We disagree. Ordinarily, in view of our conclusion hereinabove with respect to Issue I we would not have to reach this issue since the three parcels of real estate in question were held in tenancy by the entireties, and upon Everett's demise, his full legal interest therein would have passed *206 to Lura by operation of law. However, since Everett transferred his interest in these properties inter vivos by deed, his interest did not pass to her by operation of law and consequently we deem it necessary to determine the issue under section 2035, supra. Under section 2035(b), a transfer made by a decedent within three years of his death is presumed to have been made in contemplation of death "unless shown to the contrary." Section 20.2035-1(c), Estate Tax Regs., states, in part, as follows: A transfer "in contemplation of death" is a disposition of property prompted by the thought of death (although it need not be solely so prompted). A transfer is prompted by the thought of death if (1) made with the purpose of avoiding death taxes, (2) made as a substitute for a testamentary disposition of the property * * * The bodily and mental condition of the decedent and all other attendant facts and circumstances are to be scrutinized in order to determine whether or not such thought prompted the disposition. It is settled that a transfer is made in contemplation of death if the thought of death is the "impelling cause of the transfer." City Bank Co. v. McGowan, 323 U.S. 594 (1945). The *207 transfer may be so motivated even though the decedent had no idea that he was about to die. United States v. Wells, 283 U.S. 102 (1931). However, it is also recognized that every man making a gift knows that what he gives away today will not be included in his gross estate when he dies. Such gifts plainly are not made in contemplation of death in the stautory sense. Many gifts, even to those who are the natural and appropriate objects of the donor's bounty, are motivated by "purposes associated with life, rather than with the distribution of property in anticipation of death," United States v. Wells, supra, and those motives cover a wide range. Whether a desire associated with life, rather than with distribution of property in anticipation of death was the dominant, controlling, or impelling motive of a transfer, as affecting liability for estate tax, is a question of fact in each case. We are mindful that Lura, in an affidavit (in support of Schedule G of decedent's Federal estate tax return) stated that the purpose of the transfer in question was to carry out an estate plan intending to avoid Federal death taxes, and secondary purposes were to compensate her for assisting in the *208 accumulation of this property, and in part, to relieve Everett of the burden of managing this property himself. Although Lura was candid in admitting a motive to minimize or avoid taxes - which is in the mind of many taxpayers who are planning their estate - under the circumstances herein, we do not think that a desire to avoid estate tax by Everett is conclusive of a mental state such as is intended by the statutory phrase "contemplation of death." Allen v. Trust Co., 326 U.S. 630 (1946); Denniston v. Commissioner, , 106 F. 2d 925, 928 (C.A. 3, 1939). As we view the record, decedent while in robust health for his years and with no thought of imminent death transferred his interest in 260 acres of real estate to his wife on June 28, 1966. At that time Everett was about to embark with a group of farmers on a trip to Russia, with whom we had strained relations, and he wished to place the three parcels of land in the hands of Lura, who usually managed his property, in order to eliminate any difficulties which might arise by this property 310 being in their joint names. We are convinced that the transfer of the property in controversy by deed to Lura was designed to effectuate that purpose. *209 In our opinion this transfer was a material part of his ultimate plan for retirement. Unfortunately he died unexpectedly before his retirement. We are satisfied that no testamentary scheme was involved in the transfer of the three parcels of real estate and that decedent's sole or dominant motive was not to avoid estate taxes. Moreover, we are convinced that there were life motives associated with decedent's transfers to Lura, and that the facts of record are sufficient to overcome the statutory presumption that the gift in question was made in contemplation of death. III. Crider Farm As discussed hereinabove under Issue II, the Crider Farm together with the Robertson and Fountain lands were transferred by Everett to Lura as sole owner on June 28, 1966. Respondent determined that these three parcels were includable in decedent's gross estate under section 2035 or 2036, both supra, to the extent of one-half of their value at the date of death. Respondent concedes that section 2036 does not apply to the Robertson or Fountain lands, presumably on the basis of Lura's testimony. As to the Crider land, however, respondent urges that it is includable under section 2036 since petitioner failed *210 to present any proof to overcome his determination. On brief, respondent avers that he is willing to assume, arguendo, that one-half of the consideration for the Crider land was contributed by Lura since the land is not included as jointly held property on the estate tax return. Lura testified with respect to the three parcels involved herein, including the Crider land. Notably on cross-examination respondent's interrogation as to the parcels in dispute did not specifically include the Crider land; yet his cross-examination is obviously directed to the examination on direct wherein Lura testified that she collected all the rents from the Crider farm and deposited it in her separate bank account; and that most of the rent was spent by her in the renovation of the farm. In the absence of evidence to the contrary, we are satisfied that none of the rents from the Crider land was given to Everett after June 28, 1966, nor did he retain for his life the possession or enjoyment of, or the right to the income therefrom. Accordingly, we hold for the petitioner on this issue. Decision will be entered under Rule 50. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.
2. SEC. 2040. JOINT INTERESTS. The value of the gross estate shall include the value of all property to the extent of the interest therein held as joint tenants by the decedent and any other person, or as tenants by the entirety by the decedent and spouse, or deposited, with any person carrying on the banking business, in their joint names and payable to either or the survivor, except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth. * * *↩
3. In Indiana, the husband is not the owner of the rents and profits of an estate held by himself and his wife by entireties and has no separate right to the possession and proceeds thereof which he can individually dispose of or encumber or which can be sold on execution for his debts. Sharp v. Baker, 51 Ind. App. 547, 96 N.E. 627↩.
4. SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH. (a) General Rule. - The value of the gross estate shall include the value of all property to the extent of any interest therein of which decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death. (b) Application of General Rule. - If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment); but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death. 5. SEC. 2036. TRANSFERS WITH RETANIED LIFE ESTATE. (a) General Rule. - The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death - (1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.↩